94 So.2d 281

Mrs. Beulah Chiasson **DELATTE** et al.

v.

James L. **WOODS** et al.

No. 43194.

Feb. 25, 1957.

Rehearing Denied April 1, 1957.

Harvey Peltier, Donald Peltier, Thibodaux, Cobb & Wright, Joseph V. Ferguson, II, New Orleans, for defendants-appellants.

Plauche & Plauche, S. W. Plauche, Jr., Lake Charles, for appellees.

SIMON, Justice.

Plaintiffs[1] instituted this suit to annul and cancel a mineral lease and extension thereof granted by them and presently held by the defendant.

The original contract of lease, dated October 24, 1951, was granted by plaintiffs to Woods Oil & Gas Company, Inc. for a primary term of two years, and covers a 60-acre tract of land located in the Valentine Field in the Parish of Lafourche.

The lease in controversy contained the customary stipulation that if operations for the drilling of a well should not be commenced within one year from its date the same should terminate as to both parties unless on or before its anniversary date the lessee should pay or tender to the lessor or deposit to his credit in a designated bank $50 per acre, or $3,000 per year, which would cover the privilege of deferring commencement of drilling operations for an additional period of twelve months.

The original lease further provided that it should remain in force for the primary term of two years from date and as long thereafter as oil, gas or any other minerals are produced therefrom or *production is had from any part of the acreage with which said leased premises is pooled, in which latter event the lessee's drilling obligation becomes fulfilled by such production.*

It further provided that upon the completion of a well capable of producing gas in commercial quantities which was not being sold or utilized off the premises, the lessee

1. Beulah Chiasson Delatte, Lionel A. Chiasson, Elizabeth Chiasson Punch, Hilda Chiasson Cuselich, Acy A. Chiasson, Sidney J. Chiasson, Alcee J. Chiasson, Whitney Chiasson, Edmond G. Chiasson, and Eugenia Chiasson Hebert.

shall pay lessor at the rate of $200 per year, payable quarterly, for such time as said gas is not sold or utilized off the premises, and that such payment would be construed as production of gas from said land.

It is further stipulated in said lease that "Lessee, at its option, is hereby given the right and power without Lessor's joinder to pool or combine the acreage, royalty, or mineral estate covered by this lease, or any portion thereof, with other land, lease or leases, royalty and mineral estates in the immediate vicinity thereof, when, in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate said leased premises so as to promote the conservation of oil, gas or other minerals in and under that may be produced from said premises, *. * *". And that "Drilling or reworking operations on or production of oil, gas, sulphur or other minerals from land included in such pooled unit shall have the same effect in continuing this lease in force and effect during or after the primary term as to all of the land covered hereby as if such operations were on or such production were from land covered hereby." And that "In the event that any part of the land herein leased is now, or by assignment or otherwise hereafter may become, segregated from any other part, commencement of operations for the drilling of a well, the drilling of any well, and/or the produc-

tion of oil, gas, sulphur or other minerals or casinghead gasoline on any part of the above described land *or any acreage pooled therewith,* shall protect and hold under this lease all tracts of said land whether segregated or not."

On June 12, 1952, the lessee, Woods Oil & Gas Company, Inc., assigned the lease to James L. Woods, one of the defendants herein. On October 21, 1953, two days prior to the expiration of its primary term, plaintiffs and defendant James L. Woods executed an agreement extending all of its terms and conditions, for a period of one year from October 24, 1953, except as to additional and amended provisions as follows:

(a) That lessee pay delay rentals in the sum of $1,000 per month, being the first full payment for the period of October 24, 1953, to November 24, 1953, and for the right of the lessee at his option to renew this agreement each month thereafter up to a period of one year by the payment of $1,000 in advance;

(b) That the lease so extended would terminate on November 24, 1953 unless lessee commenced the actual drilling of a well on the leased premises or would pay the delay rentals of $1,000, which would extend for one month the time during which actual drilling may be commenced thereunder, with a further deferment of the commencement of drilling operations

each month thereafter during the term as extended by the payment of said monthly delay rental; and

(c) That upon the spudding in of a well upon the said property the extended lease would be maintained only so long as lessee shall pay to lessor the sum of $500 per month until such time as oil, gas or other minerals, or any of them, shall be produced and marketed, in which event further monthly payments of $500 would cease and be substituted by royalties in accordance with the terms of the original lease. The first of said payments of $500 per month would be due on the first day of the calendar month following that in which actual drilling commences.

The lease, as amended, was kept in full force and effect through August 24, 1954 by the lessee properly and timely paying the sum of $1,000 per month. The last $1,000 payment was made on or before July 24, 1954 and thus permitted the deferment of actual drilling operations until August 24, 1954. Thereafter the lessee tendered payments of $500 per month, which were rejected by plaintiffs, lessors.

In order to chronologically set forth the events bearing on this case, it is suitable to here state the undisputed fact that prior to the execution of the extension agreement two producing gas distillate wells had been successfully completed and capped by other operators on properties adjacent to or flanking the leased premises. One of

these was The Texas Company Southdown Sugars Well No. 2 (hereafter referred to as Well No. 2), a rich gas distillate located on property north of and adjacent to that of plaintiffs and bottomed in the Valentine Sand zone. This well was completed on April 20, 1953, six months prior to the execution of the extension agreement. On April 21, 1953 it was shut in for lack of a commercial market.

On July 14, 1954, the Commissioner of Conservation, pursuant to Act 157 of 1940, as amended, LSA-R.S. 30:2 et seq., following due notice to all interested parties and a public hearing had, issued its basic Order No. 280-A, dividing the Valentine Sand series of the Valentine Field into four drilling and production units with special rules and regulations governing the production of oil and gas therefrom, to become effective from and after August 1, 1954.

Among the four drilling units designated by Order No. 280-A is Unit B, containing a total of approximately 212 acres and embracing 15.04 acres of the leased premises herein.

Well No. 2 is located within the confines of Unit B.

Among the special rules and regulations governing the production of oil and gas from these established units is the ruling of the Commissioner that "The well located upon each unit is hereby assigned to the

unit upon which it is located for allowable purposes." This ruling was made in view of the finding by the Commissioner that one producing well of oil, gas or other minerals would efficiently and economically drain an area of at least 180 acres without waste of the unit's natural resources. Paragraph E of said order rules that *"Not more than one well on each unit shall be allowed to produce from the Valentine Sand series of the Valentine Field."*

Well No. 2 was recognized and declared to be commercially productive of gas and condensate in the Valentine Sand depth and thus designated as the producing well for Unit B.

This order further provided for the allocation of the production in the ratio of the acreage of the lease and sublease contracts within Unit B as it bore to the composite whole; the production of oil and gas, together with other minerals, was to be treated, developed and operated as one lease, one unit, one property and one tract; and further, that drilling and production on any of the tracts within said unit would constitute drilling operations and production under the terms of each and every one of the leases or contracts affecting the property within said unit.

It appears from the record that Well No. 2, while shut in for lack of a commercial market since the date of its completion as a distillate gas producer, underwent nominal mechanical repairs. On No-

vember 1, 1954 it was opened for production in commercial quantities and the gas produced therefrom disposed of on the market. This production has continued from that date.

Defendant Woods, taking the position that the creation of Unit B which embraced Well No. 2 constituted not only production from a tract within said unit but also constituted a spudding in of a well on the leased premises, accordingly made three monthly payments in the sum of $500 each, as provided for by the extension agreement. These payments were made on or before September 1, October 1 and November 1, 1954, and all were rejected by plaintiffs who contended that said payments failed to comply with the terms of the extension agreement, and therefore constituted a default and forfeiture thereof. Hence, this suit.

The record discloses that defendant Eunice J. Vinet, a resident of Lafourche Parish, is the assignee of an overriding royalty interest of $\frac{1}{16}$th of defendants' $\frac{7}{8}$th working interest of the production from the leased premises. It also discloses that the defendant Jones and Laughlin Steel Corporation is the holder of a mortgage granted by defendant Woods for the original principal of $1,250,000, secured by various properties and other real rights belonging to defendant Woods, including the lease at issue; and that the defendant Halliburton Oil Well Cementing Company

is the holder of a mortgage granted by defendant Woods for the original principal of $149,723.97 encumbering, besides other properties, the lease in question.

Plaintiffs sought the cancellation of the mineral lease, attorney fees, and reservation of the right to sue for further damages, as well as for the cancellation of the above-mentioned overriding royalty interest and mortgages. They contended that the unitization of the 15.04 acres of the leased land did not prevent or relieve the defendant Woods from performing the drilling obligation expressly undertaken in the extension agreement of October 21, 1953, and that this failure to do so within the stipulated period warrants the cancellation of the lease. They further contended that the original lease expressly provides that the drilling operations called for by the lease could be performed only by "James L. Woods, doing business as Woods Drilling Company, or by Woods Oil and Gas Company, Inc."; and that, this provision not having been altered by the extension agreement, the failure of defendant Woods to have personally performed this obligation is further ground warranting the cancellation of the lease.

On the other hand, defendants contended that the Unit Order No. 280-A having become effective on August 1, 1954, Well No. 2 having been designated as the unit well, and the said order having placed a limit of not more than one well on said

unit had the legal effect as though the lessee has spudded in and completed a producing but shut-in gas well on the leased property as of August 1, 1954; that, therefore, insofar as the provisions of the lease, as amended, required initial development there was full compliance with said obligation as of that date.

Defendants further contended that August 1, 1954 became the date as of which the lessee was also relieved of the payment of the $1,000 monthly delay rental; and that thereafter, in full compliance with the provisions of the lease agreement as extended, payments of $500 per month were properly made by him in lieu of the said delay rental.

It is undisputed that Well No. 2 was drilled and successfully completed as a gas distillate well in commercial quantities by The Texas Company about fifteen months prior to the effective date of the Commissioner's Order No. 280-A and six months prior to the date of the extension agreement.

After trial on the merits, the lower court rendered judgment in favor of plaintiffs, ordering the cancellation of the lease, the overriding royalty and the inscription of the mortgages, awarding plaintiffs attorney fees in the sum of $5,000 and reserving to plaintiffs the right to sue for damages.

Defendants have appealed.

Thus, the sole question before us is whether the basic Order No. 280-A of the Commissioner of Conservation, unitizing a portion of the leased land with other lands, designating Well No. 2 as the unit well, and limiting said unit to one well, constituted a production of oil, gas or other minerals affecting all lands within said unit, and, thus relieved the defendant of any drilling operations towards production or the "spudding in" or commencement of actual drilling on any portion of the entire leased premises so as to have kept in full force and effect the lease here in controversy. We are constrained to hold in the affirmative.

On numerous occasions we have reviewed and analyzed the conservation laws of this State in respect to their effect on individual and property rights. Necessarily the exercise of the police powers of a state justifies the regulation and conservation of oil, gas and other valuable mineral deposits within its territorial limits. Public interest demands not only a maximum recovery of these minerals but equally as well sound public policy in the conservation and production thereof.

In the case of Arkansas Louisiana Gas Co. v. Southwest Natural Production Co., 221 La. 608, 60 So.2d 9, 10, we find the following expression: "The Department of Conservation was created by the Constitution of 1921 for the sole purpose of protecting, conserving, and replenishing the

natural resources of this state, and the authority of the legislature to enact, and of the Commissioner of Conservation to enforce, is specifically limited to those measures that do 'protect, conserve and replenish the natural resources of the State, and * * * prohibit and prevent the waste or any wasteful use thereof.' Section 1 of Article VI of the Constitution of 1921, as amended, Act No. 328 of 1944, approved November 7, 1944. Pursuant to this authority, the legislature enacted Act No. 157 of 1940, LSA–R.S. 30:2 et seq., a comprehensive conservation statute, giving the Commissioner the authority, among other things, to prohibit the waste of oil and gas and to avoid the drilling of unnecessary wells by integrating into drilling units the maximum area he finds, as a fact, one well can efficiently and economically drain, * * * * "

In interpreting and applying these laws we are called upon to give due regard not only to public interest but to contractual relations and individual and property rights as well. However, it is firmly established that individual and property rights and contractual relations must yield to a proper exercise of the police power; and it is in the light of this principle that such laws are recognized as constitutionally valid. Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87 and cases cited therein; Smith v. Holt, 223 La. 821, 67 So.2d 93.

Plaintiffs do not contest the right of the state to regulate and control, or to prohibit the production of minerals; and in the light of the foregoing principles they do not contest the right of the State to impair the obligations of contracts under valid police powers such as was exercised by the Legislature in Act 157 of 1940 (now LSA–R.S. 30:2—30:20). The primary cause urged by all the plaintiffs for the cancellation of their lease is that the unitization of a portion of the leased premises did not prevent or relieve the defendant Woods from the performance of the drilling obligation which he expressly assumed.

■ It is firmly established in our jurisprudence that statutory authority is granted to the Commissioner of Conservation to create drilling developmental units and to integrate various tracts of various owners contained in such units, that the orders of the Commissioner supersede, supplement, replace and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. LSA–R.S. 30:1 et seq. It necessarily follows that these orders become the law as between the parties in determining their respective rights and obligations.

■ Sec. 8(b) of Act 157 of 1940, as amended, LSA–R.S. 30:9(B), authorizes the commissioner to establish drilling units so as to prevent waste and to avoid the drilling of unnecessary wells. The unit contemplated means the maximum area that might be efficiently and economically drained by one well, the owner of such tracts to share rateably according to their ownership. Such units constitute a developed area as long as a well is located therein which is capable of producing oil or gas in paying quantities.

■ The rule is too well established in our jurisprudence to require citation that the drilling and production of oil from a unitized area constitutes an exercise and user of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.

As pointed out by us in Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734, and in Crichton v. Lee, 209 La. 561, 25 So. 2d 229, the lessor in such cases received the same revenue as he would have received if the well had been located on his lands and the lessor of any particular tract can receive no more even if the well were drilled on the land covered by his lease.

■ The completion and the existence of a shut-in gas well on a validly created unit are equivalent to production on all tracts in order to interrupt the prescription accruing against royalty interest and preserve same from extinction by prescription. Union Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50; Le. Blanc v. Haynesville Mercantile Company, Inc., 230 La. 299, 88 So.2d 377.

Accordingly, the existence of a shut-in gas well on Unit B, as is shown in the instant case, rather than a producing or drilling well, in no way alters the application of these cited principles.

Under these circumstances Unit B in which a portion of the leased premises was embraced constituted a developed area as defined by the conservation statute, supra, and therefore defendant Woods was relieved from any drilling obligation called for by his lease as extended on that portion of the leased premises embraced within said Unit B.

On previous occasions we have also considered the effect of operations conducted within a validly created unit as respecting that portion of leased property located outside of the unit. In the recent case of Hunter Co., Inc. v. Shell Oil Co., Inc., 211 La. 893, 31 So.2d 10, the property therein involved was covered by two mineral leases, both dated July 26, 1935, for a primary term of ten years. The property was described as being a portion of Governmental Section 5, and a portion of Governmental Section 8, both tracts being non-contiguous. During the primary term of said leases no wells had ever been drilled on the leased lands. On December 13, 1944, six months before the expiration of the primary term, the Commissioner of Conservation issued an order establishing 640 acres as the size of drilling and proration units for the production of gas from the Anthony Sand. On July 23, 1945 the Commissioner issued a supplemental order integrating, consolidating and force-pooling all the separately owned mineral interests in Section 5 for the production of gas from said sand.

Prior to the expiration of the primary terms of the Hunter leases, and while they were in force and effect by virtue of payments of delay rentals, and prior to the unitization order of the Commissioner, a well was successfully completed in Section 5. This well was located on land other than that covered by the leases which plaintiffs sought to have cancelled and annulled, but within the consolidated unit established on July 23, 1945, of which unit only 240 acres of the leased premises formed a part. This existing well was designated as the unit well by order of the Commissioner of Conservation, which order further provided that for all purposes of the leases and sublease contracts covering lands within said unit, insofar as the same affected the production of gas and other minerals, would be treated, developed and operated as one lease, one unit, one property and one tract; and drilling operations and production on any of the tracts included in said unit would constitute drilling operations and production under the terms of each and every one of said leases or sublease contracts affecting the property included therein.

We held to the effect that production in paying quantities during the primary term of a mineral lease on a portion of an integrated pooling unit established by the Commissioner of Conservation, although not on the leased property, maintains the lease in effect beyond the primary term as to that part of the leased land lying outside the unit. The holding of such was based on the fundamental proposition well established in our jurisprudence that the lessee's obligation to drill a well is indivisable in its nature and the lessor's corresponding obligation to deliver the land is also indivisable, with the result that if the obligation of one is fulfilled in its entirety, then the obligation of the other is also fulfilled in its entirety.

In the recent case of Le Blanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855, 857, involving a factual situation similar to that presented in the Hunter case, supra, we reaffirmed the principles announced in the latter.

Plaintiffs further contend that the unitization of a portion of the leased premises did not prohibit or prevent the defendant from performing the drilling obligations on that portion of the property not included within the unit. We find the lease silent in that respect. We therefore conclude that had the parties to this lease intended that drilling operations on the area not embraced within the unit would be conducted by defendant Woods as an obliga-

tion flowing from said contract that intention would have been manifested and emphasized by express provisions contained in the lease.

In the Le Blanc case, supra, in reference to a similar contention, we said: "Moreover, counsel for the plaintiff overlook the fact that all contracts of lease with respect to the development and production of minerals in this state must, of necessity, be subject to the police power exercised in protecting these natural resources, and that any provisions in our law with respect thereto form a part of these lease contracts the same as though written therein, a fact of which the parties to the original lease themselves took full cognizance when they included a provision in the lease subjecting it to state and federal laws regulating the production and operation on the land. *Had they intended any action in pursuance to such provisions segregating and placing only a portion of the leased property in a pooling unit to have the effect of dividing the lease, they could have so stipulated in their contract.*" (Italics ours.)

Plaintiffs place great reliance in the case of Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416, as the basis for distinguishing the instant case from the decisions of this Court dealing with the effect of operations on or production from a unit area.

The Wilcox case, supra, is readily distinguishable from the instant case. This distinction lies in the fact that the former case deals with the improper and unauthorized creation of a voluntary unit, the interpretation of a contract between the parties relating to the voluntary pooling clause contained therein, and the effect of operations on an improperly created and unauthorized voluntary unit.

In the instant case we are called upon to deal with a unit compulsorily created by an order of the Commissioner of Conservation, and the interpretation and effect of a contract between the parties as to the obligations flowing therefrom but which has been substituted for and superseded by an order of the Commissioner of Conservation. It is apparent therefore that the Wilcox case is neither controlling nor analogous to that presented here.

Another ground for the cancellation of their lease as urged by plaintiffs is their contention that the Commissioner's order could not and did not amount to the "spudding in" of a well on plaintiffs' property by the defendant himself or his wholly owned company, thus maintaining that under the terms of the original lease the drilling of "spudding in" became a personal obligation of defendant Woods or his wholly owned company.

This contention, though unique, is not tenable in view of the provisions of the lease granting to the lessee the right to pool and combine the leased land or any portion thereof with other lands as well as the right to assign a portion or portions of said lease. The exercise of such rights could not be accomplished if it were literally intended by the parties that the defendant should personally perform drilling obligations. To hold otherwise would be to give a strained and untenable interpretation to the general composition of the lease and would be tantamount to lifting one phrase therefrom with a general disregard of other provisions therein contained.

Accordingly, for the reasons assigned, the judgment of the trial court is reversed, annulled and set aside and the plaintiffs' suit is hereby dismissed. All costs to be borne by the plaintiffs.

HAMITER, Justice (concurring in part and dissenting in part).

With respect to that portion of the leased premises lying within the established drilling unit I agree with the conclusion of the majority. However, I am compelled to disagree therewith insofar as the remaining portion of the tract in question is concerned (that lying without the unit) in view of my dissents, to the assigned reasons for which I still adhere, in Hunter Co., Inc. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 and Le Blanc v. Danciger Oil and Refining Company, 218 La. 463, 49 So.2d 855—decisions that are cited and relied on in the majority opinion.