125 So.2d 640 (1960)
HUMBLE OIL & REFINING COMPANY
v.
Donald H. JONES.
No. 68.
Court of Appeal of Louisiana, Third Circuit.
December 19, 1960.
Rehearing Denied January 18, 1961.
Certiorari Granted March 3, 1961.
*641 W. J. McAnelly, Jr., Bernard J. Caillouet, New Orleans, for plaintiff-appellant.
Edwin W. Edwards, Crowley, for defendant-appellee.
Before TATE, FRUGE, SAVOY, HOOD and CULPEPPER, Judges.
SAVOY, Judge.
This proceeding was instituted under the provisions of the Louisiana Declaratory Judgments Act, being LSA-R.S. 13:4231-13:4246, for the purpose of settling a dispute as to the correct method of calculating royalties due defendant under an oil, gas and mineral lease executed by defendant as lessor in favor of plaintiff as lessee.
It is a companion suit to and was consolidated for trial with a suit entitled Humble Oil & Refining Company v. Edwards et al., 125 So.2d 654.
The facts of the case are not disputed.
Defendant executed an oil, gas and mineral lease in favor of plaintiff on February 18, 1952, covering a certain parcel of land in the Parish of Acadia, Louisiana, containing 46.73 acres. The gas royalty provision of the lease provided for a 3/16 royalty for gas, including the liquid hydrocarbon content thereof sold at the well. During the primary term the lease was maintained in force by delay rental payments provided for in the lease, the last payment being made on or before February 18, 1954. The lease further provided as follows:
"Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof, as to oil and gas, or either of them, with other land, lease, or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said leased premises in compliance with the orders, rules, and regulations of State and Federal governmental authority. Lessee shall have the same rights to pool or combine acreage covered by this lease with other land, lease, or leases when to do so would, in the judgment of Lessee, promote the conservation of oil and gas from said premises, provided, however, that Lessee shall not exercise this right without obtaining the prior written consent of Lessor."
The above lease was amended by instrument dated July 13, 1954. This amendment executed by defendant expressly granted to the plaintiff at its option the right and power to pool or combine the acreage covered by said lease with other land, leases or acreage, when in lessee's judgment it might be necessary and advisable to do so to promote the conservation of gas and/or condensate, and setting forth the proposed unit by a course and distance description and further providing as follows:
"Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease *642 with other land, leases, or acreage, when in Lessee's judgment it is necessary or advisable to do so, to promote the conservation of gas and/or condensate, so as to create the following unit: [Here follows a description of the unit to be formed.] Lessee shall execute in writing and record in the Conveyance Records of the Parish in which the land herein leased is situated an instrument or instruments identifying and describing the pooled acreage. * * *"
On January 11, 1955, by virtue of the authority granted to plaintiff under the lease amendment instrument executed by plaintiff setting forth the unit to be formed, plaintiff exercising its option of the right and power to pool acreage covered by said lease, along with other leases which it held, created the 160-acre declared unit known as North Crowley Gas Unit No. 3 by filing a unit declaration instrument in the Conveyance Records of Acadia Parish. This unit declaration instrument formed the 160acre unit as to gas and condensate produced from any and all horizons, formations and zones. The unit well, known as North Crowley Gas Unit No. 3, Well No. 1, was drilled and completed in the Frio 16 Sand, Reservoir "B", as a producing gas well on January 23, 1955, and a market was obtained for the gas and condensate produced from this formation on February 1, 1955. Royalties based on the following computations were paid to defendant up to and including the month of August, 1958, to-wit:
 3/16 of 46.73/160.
On August 15, 1958, the Department of Conservation through its Commissioner, after hearings on the application of plaintiff, and in accordance with LSA-R.S. 30:10, issued its Order No. 423-G, effective from September 1, 1958, adopting and approving a production unit for the Frio 16 Sand, Reservoir "B", of the North Crowley Field and ordering that all separately owned tracts within the Conservation Unit be pooled, consolidated, and integrated with each tract sharing in the unit production on a surface acre basis on the total number of acres included in the Conservation Unit. The survey plat approved by the Commissioner as required by the order shows that there are 177.60 acres included within the Conservation Unit. The Humble Oil and Refining Company Gas Unit No. 3, Well No. 1, was designated by the order as the unit well for the Conservation Unit formed by the order.
Order No. 423-G is copied in its entirety and reads as follows:
 "State of Louisiana
 "Department of Conservation
 "Baton Rouge, Louisiana
 "August 15, 1958
 "Order No. 423-G
"Order concerning the application of Humble Oil & Refining Company for the establishment of rules and regulations governing the exploration for and the production of gas and condensate from the Frio 16 Sand of the North Crowley Field, Acadia Parish, Louisiana.
* * * * * *
"Pursuant to power delegated under the laws of the State of Louisiana, and particularly Title 30 of Louisiana Revised Statutes of 1950, and after a public hearing held under Docket No. 58-166 in New Orleans, Louisiana, on June 12, 1958, upon the application of Humble Oil & Refining Company, following legal publication of notice and notice by mail to all known interested parties in accordance with rules prescribed by the Commissioner of Conservation, the following order is issued and promulgated by the Commissioner of Conservation as being reasonably necessary to conserve the oil and gas resources of the State, to prevent waste as defined by law, to avoid the drilling of unnecessary wells, and otherwise to carry out the provisions of the laws of this State.

*643 "Definition
"The Frio 16 Sand of the North Crowley Field as used in this order is defined as being that sand productive of gas and condensate in Humble Oil & Refining Company's North Crowley Gas Unit No. 3, Well No. 1, located in Section 45, Township 8 South, Range 1 East, Acadia Parish, Louisiana, between the depths of 11,518 feet and 11,720 feet.
"Findings
"The Commissioner of Conservation finds as follows:
"1. That the establishment of special rules and regulations for the Frio 16 Sand of the North Crowley Field is necessary to prevent waste, to insure the orderly development of the field, and to prevent the drilling of unnecessary wells.
"2. That a reasonable interpretation of all available geological and engineering data indicate that a well completed in Reservoir B (as shown on Humble Oil & Refining Company's Exhibit No. G-4 for Docket No. 58-166) of the Frio 16 Sand will efficiently, adequately and economically drain the entire reservoir, which contains approximately 173 acres.
"3. That the available geological and engineering data indicate that the drilling and production unit, all as more particularly shown on the plat labeled `Humble Oil and Refining Company's Exhibit G-6 for Docket No. 58-166', is entirely underlain by productive portions of the Frio 16 Sand, will assure the owner of each separately owned tract included within such unit his just and fair share of the reservoir content, is reasonable and should be approved.
"4. That Humble Oil & Refining Company has heretofore drilled and completed within the area of the unit proposed by it, its North Crowley Gas Unit No. 3, Well No. 1, which well should be designated as the unit well.
"Order
"Now, Therefore, It Is Ordered That:
"Section IAllocation of Acreage.
"A. The unit, reference Finding No. 3 above, be and it is hereby adopted and approved as a drilling and production unit for the Frio 16 Sand, Reservoir B, for the North Crowley Field, Acadia Parish, Louisiana.
"The unit, as shown on the aforesaid Humble Oil & Refining Company's Exhibit No. G-6, is not a surveyed unit, and after such unit has been surveyed and approved by the Commissioner of Conservation, it shall be incorporated by reference in this order.
"B. The separately owned tracts within said drilling and production unit adopted by this order be and they are hereby pooled, consolidated and integrated in accordance with Section 10, Title 30 of Louisiana Revised Statutes of 1950, with each tract sharing in the unit production in the proportion that the surface area of such tract bears to the entire surface area of said unit.
"C. Not more than one well shall be allowed to produce from the unit adopted for Reservoir B in the Frio 16 Sand, North Crowley Field, Acadia Parish, Louisiana.
"D. Humble Oil & Refining Company's North Crowley Gas Unit No. 3, Well No. 1, be and it is hereby designated as the unit well for said unit.
"E. Humble Oil & Refining Company be and it is hereby designated as Operator for the unit adopted by this order.

*644 Section II
"Sections II through V of Department of Conservation Order No. 423, which order deals with the Frio 5 Sand be and is hereby made a part of this order by reference and shall apply to the sand covered by this order.
"Section IIIEffective Date
"This Order shall be effective from and after September 1, 1958.
 "Department of Conservation
 of the State of Louisiana
 "/s/ Ashton J. Mouton
 ---------------------
 "Ashton J. Mouton
 "Commissioner of Conservation"
Plaintiff following the Conservation Order No. 423-G prepared and forwarded to defendant the royalty division order which defendant has refused to sign, contending that the calculations of royalties as prepared by plaintiff were incorrect. This suit followed.
Defendant filed an answer admitting the non-controversial portions of plaintiff's petition, but disagreed with plaintiff on the method of calculation of his royalty interest. Upon these issues, the case was tried.
The lower court found that the Commissioner's unit superseded the voluntary unit and declared defendant to be the owner of certain royalties in the Commissioner's unit in the proportion of 3/16 × 46.73/177.60, he having found that the Commissioner's unit contained 177.60 acres. From this judgment plaintiff has appealed to this court.
Plaintiff's position is set forth in his brief as follows:
"In these two suits, plaintiff has alleged and takes the position that North Crowley Gas Unit No. 3, the 160-acre Declared Unit, created either by contractual agreement or by general pooling authorization of the mineral leases, has not been superseded or abolished as to the Frio 16 Sand, Reservoir "B", and that consequently plaintiff has offered to pay royalties to defendants herein on the basis that each defendant is entitled to receive the royalty provided for by his lease based on production from the Conservation Unit well attributable to his surface-acre participation in the Conservation Unit in the ratio that the number of surface acres covered by his lease and included within the Declared Unit bears to the total number of surface acres included in the Declared Unit. For each defendant the calculation was as follows:
"Under the Jones Tract:
 Donald H. Jones 3/16 × 46.73/177.60 × 46.73/160.00
* * * * * *
"Stated in the simplest terms, production from the Commissioner's Unit was allocated back to the individual tracts as the ownership of defendants appears, and the part of production attributable to these tracts was then allocated to the defendants herein based on their surface-acre participation in the 160-acre Declared Unit. Accordingly, the royalty division order as submitted to defendants, Exhibit H-6 in both suits, covers the division of production attributable to the entire 101.13-acre overlap area rather than just that portion of production from the Commissioner's Unit attributable to the Jones and Edwards tracts. As shown on this Exhibit H-6, each of the defendants to these two suits, based on the plaintiffs' theory of royalty computation, was credited with the following:
"Under the Jones Lease, Covering the Entire Overlapped
Area:
 Donald H. Jones 3/16 × 101.13/177.60 × 46.726/160
* * * * * *
Defendant took the position that under the Commissioner's unit he was entitled to be paid royalties due under the lease which he granted to plaintiff as follows:
 3/16 × 46.73/177.60.
Counsel for plaintiff and defendant stated orally and in their written briefs that the issue to be resolved in the case at bar has never been decided by the appellate courts of this state and it is res novo insofar as the factual situation is concerned.
*645 In support of its position, plaintiff relied on the cases of Monsanto Chemical Company v. Southern Natural Gas Company, 234 La. 939, 102 So.2d 223, and Arkansas Louisiana Gas Company v. Southwest Natural Production Company et al., 221 La. 608, 60 So.2d 9, whereas defendant relied on the cases of Alston v. Southern Production Company, Inc. et al., 207 La. 370, 21 So.2d 383; Delatte et al. v. Woods et al., 232 La. 341, 94 So.2d 281, and Everett et al. v. Phillips Petroleum Company, 218 La. 835, 51 So.2d 87.
The Monsanto case, supra, was a suit for a declaratory judgment concerning the right of proceeds of production from a Conservation Unit established in the Bear Creek Field of Bienville Parish. Monsanto and Southern Natural were the owners of mineral leases covering all of Section 31, Township 17 North, Range 5 West. They entered into an operating agreement covering their interests in this section as to gas and distillate production from any and all underlying horizons, formations, or zones. In accordance with this agreement a well was drilled in Section 31 and completed in the Hosston formation of the field. Subsequently, the Commissioner of Conservation by Order No. 78-F severed 126.4 acres from the southern part of Section 31 and added them to an adjoining 640-acre unit created as a production unit for the Pettit formation of the Bear Creek Field. Monsanto's lease, contributed to form the Section 31 unit, did not cover any part of the 126.4 acres added to the adjoining Conservation Unit for Pettit formation production, and Monsanto instituted suit to secure a judgment decreeing it to be entitled to its proportionate share of the proceeds of production from the Pettit formation unit attributable to the 126.4 acres located in Section 31. Defendant Southern Natural contended that the agreements on which Monsanto relied are inconsistent with and therefore superseded by Order No. 78-F insofar as the Pettit formation underlying the 126.4 acres was concerned.
The Supreme Court adopted the position taken by plaintiff and held that the only thing involved was the judicial determination of the rights of the lessees who were joint operators and had no effect whatsoever upon the Commissioner's order. The Court held further that it was beyond the functions and powers of the Conservation Commissioner to say whether or not alleged contractual rights under the conventional agreements between the lessees were recast and affected by the order of the Commissioner, that this was a matter to be decided by the courts.
In the Arkansas Louisiana Gas Company case, supra, Arkansas Louisiana Gas Company was designated as producer and operator of a well drilled in a section in Lincoln Parish under the terms of the operating agreement entered into among all of the lease and mineral contract owners for the development pursuant to an order of the Commissioner of Conservation establishing 640-acre units in the Ruston field. A disagreement between two of the lessees under the operating agreement ensued, and a suit was instituted under the provisions of LSA-R.S. 13:4231-4246 for the purpose of obtaining a judgment settling the dispute existing between the parties with respect to the basis for calculating the royalties to be paid the mineral and royalty owners. The sole issue for discussion was: Were the royalty owners throughout the unit entitled to be paid on the basis of the return from the sale of all gas and distillate produced from the unit, or only on the basis of the amounts realized by their own lessees from the sale of the proportion of the production allocated to the tract in which they had an interest?
The Supreme Court said that the various lessees under the operating agreement had individual contracts to sell their proration of the production from said well or wells in said field for a certain specified price; that the Commissioner's order had no other effect than to allocate to each tract its pro rata share of the production from the *646 entire tract, based on the proportion the acres contained in the individual tract bears to the total number of acres in the unit, and consequently, that the lessees of the tracts contained in the unit were obligated to account to their royalty owners only on the basis of the proceeds realized by them from the marketing of the production thus allocated to the tract, and in accordance with the terms of the individual lease contracts existing between the respective lessors and lessees.
The Court found further that the order of the Commissioner establishing 640 acres as the area in which the sands should be developed in the Ruston field did not intend to and did not abrogate the contracts between the several lessors and their respective lessees with respect to the nature of their mineral ownership, or alter in any way the consideration to be paid and the method of payment. The order was intended as a conservation measure onlyto insure that the pool of gas in these sands underlying this section would be efficiently and economically drained,and if it is to be given the effect contended by the plaintiff, not being a conservation measure, it would be beyond the constitutional and legislative authority given the Commissioner, and, therefore, an illegal extension of authority.
The trial judge decided this case on the authority of Delatte v. Woods, supra, and Everett v. Phillips, supra.
The Delatte case, supra, is merely authority for the proposition that a lease obligation for the actual drilling of a well on the leased premises was satisfied by inclusion of a part of the leased premises in the production unit. It is therefore not controlling in the case at bar.
In the Everett case, supra, the Supreme Court held that a clause in an oil and gas lease requiring payment of a 1½ per cent royalty in event of production from adjoining property under lease from other lessors to lessee if a well were discovered within 1,320 feet of lessors' land and there was no drilling on lessors' land, was not applicable where the well draining leased premises was within a drilling unit of which leased land formed a part, and where lessee was forbidden by order of the Commissioner of Conservation from drilling a well on the leased premises.
Alston v. Southern Production Company, Inc. et al., supra, held that the provisions in a mineral lease providing for a unitized tract of 320 acres under authority of a conservation order, the drilling of a well thereon, and the payment of royalties on the basis of each acre being entitled to a royalty calculated accordingly, were superseded by a subsequent order requiring 640-acre spacing and therefore each acre was allocated 1/640 of production rather than 1/320 of production. The Court held that the Alston case, supra, was authority for the proposition that private contractual rights are only superseded when they are in conflict with the valid orders of the Commissioner of Conservation, namely, when the order is a conservation measure, pure and simple.
Plaintiff relies strongly on the Monsanto case, supra.
The Monsanto case, supra, is distinguishable from the case at bar in that it involved operators with fixed investments. There it properly should be assumed that the operators intended to freeze their original participations unless they expressly contracted to the contrary.
As to royalties, the opposite is true. In the case at bar, the Commissioner has found the true participations. When this is done, the parties should not be presumed to have agreed to share their interest on the old declared unit unless they show a specific and positive intention to freeze the old unit.
None of the other cases cited by counsel for plaintiff and defendant are applicable to the case at bar. They differ factually.
Section 4 of the original lease agreement between plaintiff and defendant, and the amendment thereof, provides that plaintiff is given the right and power to pool and combine the acreage covered by the *647 lease with other lands or leases when in lessee's judgment it is necessary or advisable to do so to promote the conservation of oil and gas from said premises.
There is nothing in Section 4 of the original lease or amendment thereto which indicates that defendant ever intended that his royalty interest be frozen by a voluntary unit formed by plaintiff. Later events proved that plaintiff was in error in forming the original voluntary unit. The Commissioner's unit was approved by geologists for plaintiff and the Conservation Commission. The Commissioner's unit included property left out in the original unit and excluded some which had been included in it originally. The Commissioner must have concluded that certain lands included in the voluntary unit were not within the productive area of the Frio 16 Sand Reservoir B.
Sun Oil Company has filed an amicus curiae brief championing the position taken by plaintiff in the case at bar.
In his brief counsel for Sun Oil Company makes the following statement:
"It is difficult to conceive that having so contributed acreage to the drilling of a well, the lessors or royalty owners of the acreage subsequently determined to be non-productive by data from said well (or even more severely by data from other wells drilled several years thereafter) should be excluded from contractual participation in portions of the unit so determined to be productive."
The position of counsel for Sun apparently is that landowners who participated in the voluntary unit have fixed rights because of the contractual agreements, as evidenced by the pooling authority of their respective leases and the unit created by their lessee in strict compliance therewith.
If the position of counsel for Sun is maintained, Jones and Edwards, defendants in these companion cases, would be adversely affected, for their royalties would be drastically reduced under the theory out-lined for Sun and plaintiff.
It does not appear to this Court that the lessor could be said to have frozen his royalty interests in the voluntary unit unless he so declared in the lease agreement. The very purpose for which a lessor signs an individual lease contract with his lessee with a pooling agreement therein is for the purpose of getting his equitable and just share of oil and gas in the pool and to prevent drainage of his land.
In the Arkansas Louisiana Gas case, supra [221 La. 608, 60 So.2d 10], Honorable John B. Fournet, organ of the court, made the following comments about the purpose for which the Department of Conservation was created, to wit:
"The Department of Conservation was created by the Constitution of 1921 for the sole purpose of protecting, conserving and replenishing the natural resources of this state, and the authority of the legislature to enact, and of the Commissioner of Conservation to enforce, is specifically limited to those measures that do `protect, conserve and replenish the natural resources of the State, and * * * prohibit and prevent the waste or any wasteful use thereof.' Section 1 of Article VI of the Constitution of 1921, as amended, Act No. 328 of 1944, approved November 7, 1944. Pursuant to this authority, the legislature enacted Act No. 157 of 1940, LSA-R.S. 30:2 et seq., a comprehensive conservation statute, giving the Commissioner the authority, among other things, to prohibit the waste of oil and gas and to avoid the drilling of unnecessary wells by integrating into drilling units the maximum area he finds, as a fact, one well can efficiently and economically drain, Section 8(b) now LSA-R.S. 30:9, subd. B, the owners of separate tracts of land embraced within these units being permitted `to pool their interests and to develop their lands as a *648 drilling unit,' and the Commissioner, in the event they refuse so to do, being authorized to require them to. Section 9(a), now LSA-R.S. 30:10, subd. A and (1). The orders requiring such pooling `afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense' and `prevent or minimize reasonable avoidable drainage from each developed tract which is not equalized by counter drainage' Section 9, subd. (a), now R.S. 30:10, subd. A(1) (a), and `The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon.' Section 9(a), now LSA-R.S. 30:10, subd. A(1) (b). In Section 2(h), the word `owner' is defined as `the person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others.' Now LSA-R.S. 30:3(8)."
If the theory advanced by the plaintiff should be followed, plaintiff although agreeing with the respective owners to have a 160-acre unit would in effect have a unit of approximately 236 acres. It would be allowed to retain by its own acts, contrary to its lease agreement, a greater amount of acreage under the leases without further drilling activity and without payment of delay rentals. Said action would be in conflict with its prior agreement forming the voluntary unit and with the conservation order which determined that the unit should contain 177.60 acres.
To adopt plaintiff's position would also allow landowners whose lands are not within an oil or gas reservoir to participate in royalties to which they are not entitled. This would defeat the very purpose for which the Department of Conservation was formed.
For the written reasons assigned, the judgment of the district court is affirmed.
Affirmed.
TATE, Judge (dissenting).
It is with distinct regret that the writer must differ from the opinion of his learned and well-intentioned brethren of the majority and must register a strong dissent from any view that an order of the Commissioner of Conservation may, in the absence of any conservation necessity, alter or destroy the contractual rights of private parties to share in oil production. With the utmost respect for the views of my brethren, I must also point out that no legal authority is cited which holds that a conservation order of the Commissioner destroys private contractual rights not in conflict therewith and that, in fact, the preponderant jurisprudence is contrary to the result here reached.
It should probably further be stated that the value of investments in producing royalty interests is drastically lowered if, what up until this decision has been regarded as a vested royalty right to share in the production attributable to an acreage-unit formed by joint consent of all the land and mineral owners included, may be divested many years (or even a few months) later of any right to share in the unit's mineral production without the owners' consent and simply by a Commissioner's order, which is not and constitutionally cannot (in the absence of a conservation effect) be concerned with the private owners' division among themselves of the royalty proceeds.
To re-state the facts in brief, in early 1955 Humble and defendant Jones by specific written assent joined with the other lessors and royalty owners of the tracts affected in forming pursuant to contractual authority granted by the leases an 160-acre Declared Unit known as North Crowley Gas Unit No. 3 (hereinafter referred to as the "contractual unit"). "In consideration of the mutual advantages accruing to each" *649 (Tr.17), these parties agreed that this 160-acre tract would be developed as a single unit and that the proceeds of production from this 160-acre tract would be allocated to the mineral and royalty ownerships affecting the pooled individual tracts in the proportion that each individual tract's acreage bore to the 160 acres of the combined contractual unit. Thus to the 46.73-acre tract owned by defendant Jones, which had been combined with other tracts to form the 160-acre unit, was allocated 46.73/160th of the production accruing from the entire unit.
On January 23, 1955, a producing gas well was completed which was located within the unit (and which was, in fact, located on defendant Jones' land), and royalties based upon the contractual unit proportions were thereafter paid to the mineral and royalty owners of the entire unit up through August, 1958, three years later. At this point, it should be stated that all parties concede that the contractual unit was formed in good faith and on the basis of then current geological data.
Before proceeding to a discussion of subsequent events, I think it is well at this point to note the rights of the parties to this contractual unit, and especially of the owners of the mineral and royalty interests of the 58.87 acres of the contractual unit which were not included in the subsequent Commissioner's unit and which under the decision of this court will lose all right to share in any further production from the unit well, from which for almost four years they have drawn royalties based upon their acreage participation in the unit well.[1]
Although the Jones tract received only 46.73/160th of the oil produced from it, nevertheless the owners of mineral production from that tract were bound by their contractual agreement to so share production with the other interests of the 160-acre unit; and we should not at this point forget that, had the well been situated on land owned by others instead of upon the Jones tract, nevertheless the Jones' interests would similarly have shared in the production. This was what the mineral and property owners had agreed, in order to assure drilling and production, in consideration of the mutual advantages accruing to each. Royalty interests in the acreage combined in the contractual unit have been sold or retained based upon the expectation that they would continue to share in the production allocatable to the pooled acreage. Neither in the unit pooling agreement itself nor in the lease provisions under authority of which the unit was formed is there the slightest indication that the contractual unit can be dissolved without the consent of the mineral and royalty owners.
Had those participating in the unit intended that the contractual unit be dissolved by inclusion of any of its acreage in drilling unit formed by Commissioner's pooling orders, such a contractual provision could *650 have been inserted in the leases and pooling agreement. It was not. Although the lease authority to form the contractual unit states that such a unit is formed "when in Lessee's judgment it is necessary or advisable to do so to promote the conservation of gas and/or condensate", once when such a unit is formed based upon such good faith consideration (as is conceded to be the present case), the lease is bare of the slightest intent or provision permitting non-contractual dissolution of the contractual rights so created to share in any production from any sand attributable to the 160-acre contractual unit.
In the absence of a valid conservation order based as it constitutionally must be upon the police powers of the state to conserve our natural resources, I think it is outside of the power of the courts to alter this contractual pooling agreement of the parties, based upon which valuable mineral properties have been bought, sold, or retained.
It should be noted that the Commissioner's Order No. 423-G of August 15, 1958, quoted in full in the majority opinion, did not by its terms refer to or intend to abolish the old contractual unit. In order to conserve oil and gas, prevent waste, and avoid the drilling of unnecessary wells, the Commissioner's order approved Humble's application, based upon evidence presented by Humble's geologists, and created a drilling and production unit (hereinafter referred to as the "Commissioner's unit") of 177.60 acres to assure orderly production of the Frio 16 Sand, Reservoir B, which reservoir the testimony of Humble's geologists showed to be located under the 177.60 acres in question. The Commissioner's order further designated the previously drilled well as the only unit well to be permitted, and the order provided that the separately owned tracts within the Commissioner's unit were pooled in accordance with LSA-R.S. 30:10, "with each tract sharing in the unit production in the proportion that the surface area of such tracts bear to the entire surface area of said unit."
All parties concede, as the writer of course does also, that the order in question is a valid regulation of the Commissioner enacted pursuant to his constitutional and legal authority to promote the conservation of our oil and gas resources. To some extent, of course, this regulation enacted for a conservation purpose affects private interests in mineral interests in the land affected:
For instance, only one well may be drilled in the 177.60-acre unit, even though it might obviously be to the short-range financial interest of the private owners to have two, three, or four wells drilled. Likewise, for instance, the 46.73-acre Jones tract upon which the well is situated must share its production with the other tracts within the 177.60-acre Commissioner's unit, even though the Jones well was already a producing well at the time the Commissioner's unit was formed, and including tracts which up until that time had no right to share in the production from the well. But these effects are the price that must be paid to assure the orderly and most efficient production of our mineral resources in the interests of the general welfare of the State and pursuant to a constitutional delegation of police power to the Commissioner.
But the majority of this court has unintentionally taken a long additional step in derogation of private property when it also holds that the creation of this drilling unit by the Commissioner has ipso facto abolished the contractual unit formerly created by the consent of the private owners and has destroyed the right of some of these owners to share in the production of the unit well under the terms of the contractual unit previously formed, when such abolition of the contractual unit and destruction of the private rights rooted therein has no relationship whatsoever to the conservation of natural resources or any other constitutional base of the Commissioner's authoritywhen, in fact, the Commissioner's order on its face does not indicate even that it intended to usurp such power over private property.
*651 Therefore, in my opinion, Humble correctly contends that the proper way to divide the oil royalties from the unit well is, first, to allocate the production to the acreage within the Commissioner's unit in accordance with the provisions of the order creating it that each tract should share in the unit production in the proportion that its surface area bore to the entire surface area of the unit.[2]
This initial allocation of the proceeds is in accordance with the Commissioner's valid order creating the Commissioner's unit, and all parties concede the validity of this initial stepthe defendant landowner contending that, with this allocation, any further division or allocation of the proceeds is unnecessary, since allegedly the Commissioner's unit superseded the contractual unit.
However, insofar as the share of production attributable to the 101.13 acres of the Commissioner's unit included in the original contractual unit, Humble also contends, correctly in my opinion, that this share of production (101.13/177.60th) should further be allocated, for purposes of dividing the production of the Commissioner's unit among the property owners entitled to it, to each of the tracts in the original contractual unit (whether or not such acreage is also within the Commissioner's unit) in the proportion that the acreage of each tract in the contractual unit bears to the 160 acres of such unit.[3] By so doing, Humble contends that it has recognized the valid contractual agreement of the parties as to how to divide any production from any of their individual tracts pooled by mutual agreement, and that it has also recognized the statutory direction as to allocation of the production from the Commissioner's production unit set forth at LSA-R.S. 30:10, subd. A(1) (b): "The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced, be considered as if it had been produced from his tract by a well drilled thereon."
In short, under this quoted statute the 101.13/177.60th of the Commissioner's unit production allocated to the 101.13 acres included within it that also form part of the contractual unit are considered as if produced from the 101.13 acres, and the remaining production (the 76.47/177.60th of the production allocated to the 76.47 acres included in the Commissioner's unit and not forming part of the contractual unit) is considered as if produced from wells located upon this other 76.47 acres of land and has no bearing on how the production upon the 101.13 acres within both units is to be divided, which is regulated by the contractual agreements of the owners of it.
Except that it concerned working mineral interests rather than royalties (a distinction without a legal difference so far as the present *652 question is concerned), the Supreme Court in Monsanto Chemical Co. v. Southern Natural Gas Co., 234 La. 939, 102 So.2d 223, has decided this identical question adversely to the contentions of the defendant and in accordance with the views set forth by Humble.
In 1947 and 1948, the plaintiff Monsanto and the defendant Southern had by contract formed a 640-acre production unit, combining tracts individually leased by each of them. Subsequently, in 1955, the Commissioner formed a partially overlapping 640-acre unit which included 126 acres of land leased by Southern and also included within the original contractual unit. Although Southern contended that it need not share with Monsanto the production from the Commissioner's unit which was allocated to the 126 acres included within both units, the Supreme Court expressly held that the parties to the original contractual unit were entitled to share such production in the proportion each was entitled to do so under the terms of the original contractual unit. Rejected was Southern's contention that the overlapping Commissioner's unit had superseded the contractual unit.
Pertinent to the present case, the Court observed, citing Arkansas Louisiana Gas Company v. Southwest Natural Production Company, 221 La. 608, 60 So.2d 9, that "the unitization of several tracts under lease, pursuant to valid orders of the Commissioner, has no other effect than to allocate to each tract its pro rata share of the production from the entire unit", 102 So.2d 225, and that the creation of a Commissioner's drilling unit "did not intend to, and did not, in fact, abrogate the contracts between the several lessors and their respective lessees with respect to the nature or structure of their mineral interest or alter in any way the consideration to be paid and in the method of payment", 102 So.2d 226. As the court further stated, with specific reference to the Delatte and Alston cases, below-cited, upon which the present defendant-appellee relies, such decisions did not concern "the contractual rights of the parties with respect to the royalty due and the proper method of computing and paying it" and were not therefore controlling, but "In fact, they are authority for the proposition that private contractual rights in these leases are only superseded when they are in conflict with valid orders of the Commissioner of Conservation, i. e., when the order is a conservation measure, pure and simple", 102 So.2d 227.
No more than in the Monsanto case does the Commissioner's unit in the present case conflict with the contractual unit created by the parties, and it cannot therefore be regarded as superseding it.
The majority has correctly found inapplicable the cases of Delatte v. Woods, 232 La. 341, 94 So.2d 281 and Alston v. Southern Production Company, 207 La. 370, 21 So.2d 383, upon which authorities alone able counsel for the plaintiff-appellee relies. The first decision simply held that a lease obligation calling for the drilling of a well on the leased premises was satisfied by inclusion of a portion of the leased premises within a drilling unit formed by the Commissioner's order. The Alston case held that the Commissioner could enlarge a Commissioner's drilling unit from 320 to 640 acres, with proportionate consequent effect upon the division of the royalties among the mineral owners (although the court did specifically note that the initial Commissioner's unit had been specifically "subject to change by the Commissioner", 21 So.2d 386). Both of these cases therefore concern instances where in the interest of conservation the Commissioner limited the number of wells which could be drilled on land subject to mineral lease.
Neither of these cases concern an instance where a Commissioner's order was held to supersede a private contractual agreement with which the Commissioner's order was not in conflict and for a reason totally unrelated to conservation.
*653 As Chief Justice Fournet stated in Arkansas Louisiana Gas Company v. Southwest Natural Production Company, 221 La. 608, 60 So.2d 9, 10,
"The Department of Conservation was created by the Constitution of 1921 for the sole purpose of protecting, conserving, and replenishing the natural resources of this state, and the authority of the legislature to enact, and of the Commissioner of Conservation to enforce, is specifically limited to those measures that do `protect, conserve and replenish the natural resources of the State, and * * * prohibit and prevent the waste or any wasteful use thereof.'" (Italics mine.)
In holding that despite this constitutional limitation upon the Commissioner's power that the order with which we are presently concerned has the effect of divesting private owners of their contractual interest in a contractual unit formed by their contractual consent, even though there is no showing that the abolition of their contractual rights has any relationship to conservation, my very learned and able brother of the majority states that to hold otherwise would be to "allow landowners whose lands are not within an oil and gas reservoir to participate in royalties to which they are not entitled", which it is alleged "would defeat the very purpose for which the Department of Conservation was formed".
It should simply be observed that nowhere in the Constitution or statutes are owners of land and mineral and royalty interests prevented from contracting from another to share the production from any place on land that they agree to pool, whether or not the well is drilled on their own land and whether or not it is later found that the reservoir does not lie beneath the land of some of the landowners so contracting.
In my judgment, the Department of Conservation has no interest whatsoever in such contractual agreement of the parties, and the courts must enforce such agreements dividing mineral proceeds when they are not in derogation of statute or public policy, as it is not even suggested that the present contractual pooling agreement was.
In closing, the words of Chief Justice Fournet dissenting in Alston v. Southern Production Co., 207 La. 370, 21 So.2d 383 bear repetition here, when he objected even to the Commissioner's increasing the acreage of a unit formerly created by Commissioner's order which under its terms (as the present contractual unit is not) was specifically subject to future change by the Commission, observing that even in such an instance the Court's holding, 21 So.2d 387:
"* * * in my opinion, gives the Commissioner such power as enables him to change these orders, true under the formality of a hearing, at his will, thus tending to create confusion and uncertainty as to valuable property rights. * * *.
"In other words, if the holding in the majority opinion is allowed to stand, the property rights of small property owners can, to all effect and purpose, be confiscated or else rendered valueless, for such a property owner, not being able to maintain at yearly salaries the geologists and experts at the command of the state and the large companies, is unable to produce expensive scientists and experts as witnesses at, or bear other expenses incidental to, such hearings indefinitely."
For the reasons perhaps too fully stated I must therefore disagree with the views of my conscientious brethren of the majority.
Rehearing denied; TATE, J., dissents.
NOTES
[1] These parties are not represented in this declaratory action brought by the lessee only against the lessor and royalty owner of a 46.73-acre tract included within both the contractual unit and the subsequently formed Commissioner's unit. Of course, it is to the interest of this landowner to disregard the former contractual unit which he and the other landowners had formed in consideration of the mutual advantage accruing to each, and actually no one represents the point of view of the mineral and royalty owners whose interests will become valueless if the majority stands, since Humble will pay no more total royalties should either result ultimately obtain.

This absence of necessary or indispensable parties gave the writer some concern, since there is authority that in such absence the suit should at least be remanded for proper impleader. Horn v. Skelly Oil Co., 221 La. 626, 60 So.2d 65; Jamison v. Superior Oil Co., 220 La. 923, 57 So.2d 896. In deference to the conscientious and able efforts of Humble's attorneys to champion the interests of these unrepresented property owners, which I assume includes an application for rehearing and for writs of review to the Supreme Court, the writer does not at this time intend to raise this question ex proprio motu, although the cited cases indicate such would be permissible.
[2] Thus 101.13/177.60th of the oil production was allocated to the 101.13 acres of the Commissioner's unit which also formed part of the contractual unit; this acreage included the 46.73 Jones tract, to which thus was first allocated 46.73/177.60th of the production of the Commissioner's unit.
[3] Thus, for instance, the defendant Jones' tract would be allocated 46.73/177.60 of the production from the Commissioner's unit, if no contractual unit had ever been created; however, in Humble's view, since the contractual unit has been created and must be recognized as a valid property interest affecting production, the Jones tract receives 46.73/160th of Commissioner's unit production attributable to the 101.13 acreage of the original 160-acre contractual unit included within the partially overlapping 177.60-acre Commissioner's unit: thus under these computations the Jones tract being allocated only 46.73/160th of 101.13/177.60th of the oil.

Likewise, however, the mineral and royalty owners of the 58.87 acres in the contractual unit not included in the Commissioner's unit would receive 58.87/160th of the 101.13/177.60th of the production allocated the acreage of the contractual unit included within the Commissioner's unit; although, if the contractual unit is disregarded as if it had never been created, such property owners will receive nothing.