SAVOY, Judge
(concurs in the results).
After examining the Unit Operating Agreement and the Royalty Owners Uniti-zation Agreement in the instant case, I am of the opinion that the results reached by the author of the majority opinion are correct although I disagree with a portion of his reasons for judgment.
From a reading of the decisions of our Supreme Court dealing with voluntary units, it appears that they fall in three categories, with certain presumptions attaching to two of them. These are:
(1) Units declared by the lessee alone under the pooling clauses of the different leases. In this type of case, the lessors did not intend to “freeze” their interests, and if the units are thereafter changed by the Conservation Commissioner, the declared units must give way to the Commissioner’s units unless the pooling clauses of the lease are specific to the contrary. In other words, there is a presumption here that the change is contemplated. This is in essence what we held in Humble Oil & Refining Co. v. Jones, (Ct.App., 3 Cir., 1960), 125 So.2d 640.
(2) Voluntary units, formed through a complete agreement signed by all lessors and lessees, should not be subject to change by the Conservation Commissioner’s order unless the parties have expressly stipulated for this change in the agreement. Here it is presumed that the parties intended to freeze their rights because all of the parties participated in the confection of the voluntary unit agreement, and where they agreed on certain fixed interests and did not contract to have them changed, their contract should be the law of the contract.
(3)The third type of agreement is the one under consideration in the instant case. It does not involve a head-on clash between the voluntary unit and the Commissioner’s unit as do the other two types of units discussed herein. This is emphasized by Conservation Commissioner Hussey’s clarification of his own order. Rather, it involved determination of exactly what is covered by the “Erath” agreement, and if the School Board sand is found to be so included, there is no conflict at all, since the parties would then be in a position to have the “new equities” submitted to the Conservation Commissioner for approval.
The instant case is one where the parties failed to spell out the making of further adjustments of equities after 1944, and yet, did not specifically “freeze” the equities as of that date for the remaining life of the contract.
It is my understanding that all of the more modern agreements squarely cover the contingency, one way or the other.
I am of the opinion that the results reached by the majority and the trial court are correct for the following reasons:
(1) Since the geologists have established that the School Board sand and the “unnamed sand found in Phillip Fitzsimmon’s No. 1 Well” are the same, I believe that the School Board sand is specifically covered in the definition of Unitized Substances. (I disagree with Judge Putnam that it has to be covered under the second paragraph of Par. 1(b).) I believe it is the same sand, divided by a fault. This was defined in the first paragraph of Par. 1(b). The definition is not restricted to reservoirs, but refers to sand or reservoirs (a sand, unlike a reservoir, extends across a fault.) It appears that this sand was specifically covered, but that its total productive area was not covered in 1944.
(2) If I should be in error as to the conclusions reached in No. 1, the School Board sand clearly falls within the definition contained in the second paragraph of 1(b), as stated by Judge Putnam.
*395 (3) The paramount reason why it appears to me that the sand must be included is the drastic effect that a contrary conclusion would have on the contract as a whole. Certainly there is no difference between this sand and a new 15,00(7 gas sand that might be discovered tomorrow within the unit area, in fact, for the reasons outlined in No. 1, it may be even clearer that the sand is covered.
But, going back to our assumed new 15,000' sand, it clearly would be covered by the second paragraph of Par. 1 (b); just as clearly under Article IX, page 5, of the Royalty Owners Unitization Agreement; drilling to and completion under each of the unitized leases so as to maintain them in effect; equally as clear is the fact that the completion in this sand would not be a non-unitized operation under Paragraph XVII, page 7, of the Royalty Owners Unit-ization Agreement.
However, if we hold that the equities were “frozen” as of 1944, there simply would be no method whatever of bringing this sand in the unit.
In effect, this would require a holding that after June 1, 1944, all provisions of the contract relating to sand below 8,00(7 must be wiped out except for the specific sands included in equity determinations made on that date. I cannot find an intention to do this in the agreement.
I also find that the Operating Agreement was amended in 1949, and that the parties preserved sub-paragraph 11 of Article XI of the Operating Agreement providing for the adjustment of equities and ownerships in the unit area.
The record reveals that the School Board did not receive any equity in the Erath Unit for the School Board sand which was found in 1955 or 1956, north of the fault.
It appears to me that the more reasonable construction of the agreement is the one which tends to give it effect rather than to partially destroy it.
For the above reasons, I concur with the-results reached by the majority in the instant case.
On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., is of the opinion that a rehearing should be granted.