157 So.2d 110 (1963)
HUMBLE OIL & REFINING COMPANY, Plaintiff and Appellant
v.
Donald H. JONES et al., Defendants and Appellees.
No. 888.
Court of Appeal of Louisiana, Third Circuit.
September 11, 1963.
Rehearing Denied October 23, 1963.
Dissenting Opinion November 5, 1963.
Bernard J. Caillouet, Peter R. Monrose, Jr., W. J. McAnelly, Jr., New Orleans, for plaintiff-appellant.
H. Purvis Carmouche, Jr., Crowley, Percy Sandel, R. Cornelius Smith, Joseph G. Hebert, New Orleans, Edwards & Edwards, by Edwin W. Edwards, J. Lyle DeBellevue, Crowley, James C. Arceneaux, Jr., Rayne, J. E. Kibbe, Abbeville, Hargrove, Guyton & Van Hook, by Elmon W. Holmes, Shreveport, for defendants-appellees.
En Banc.
HOOD, Judge.
This is an action instituted under the Louisiana Declaratory Judgments Act (then LSA-R.S. 13:4231-13:4246, but now LSA-C.C.P. Articles 1871-1883), to settle a dispute between the plaintiff and some of the defendants as to the correct calculation of royalties due under certain oil, gas and mineral leases either executed by defendants or covering their royalty interests. These oil, gas and mineral leases are owned by plaintiff.
On January 11, 1955, pursuant to provisions contained in the above-mentioned leases or amendments thereto, plaintiff created a 160-acre pooled unit in the North Crowley Field by filing a unit declaration instrument in the Conveyance Records of Acadia Parish. This 160-acre "Declared Unit" affected and applied to gas and condensate produced from any and all horizons, formations or zones beneath the surface area included in the unit. On January 23, 1955, a unit well was completed in the Frio 16 Sand, Reservoir "B", as a producing gas well. A market was obtained for the gas and condensate produced from this well on February 1, 1955, and from that time until the end of August, 1958, the royalties specified in the leases were paid to defendants on a surface acre basis, that is, for the purpose of computing royalties each lease in the unit was allocated the same proportion of the production from the unit well as the number of surface acres covered by that particular lease bore to the total unit acreage of 160 acres.
*111 On August 16, 1958, the Commissioner of the Louisiana Department of Conservation issued an order adopting and approving a production unit for the Frio 16 Sand, Reservoir "B", of the North Crowley Field, effective September 1, 1958, and ordering that from and after that date all separately owned tracts within the Conservation Unit be pooled, "with each tract sharing in the unit production in the proportion that the surface area of such tracts bears to the entire surface area of said unit." The "Conservation Unit" thus created, containing 177.60 acres, overlapped a part of the "Declared Unit," there being 101.13 acres of the Declared Unit included within the Conservation Unit.
A dispute then arose between plaintiff and some of the defendants as to the correct amount of royalty due to the defendants on production of a Conservation Unit well from the Frio 16 Sand, Reservoir "B". This suit was instituted on April 7, 1959, for a declaratory judgment to settle the dispute. While the suit was pending, another order of the Commissioner of Conservation was issued revising the Conservation Unit so that thereafter the unit contained only 165.65, instead of 177.60, acres. Even with this revision, however, the Conservation Unit continued to overlap 101.13 acres of the original Declared Unit, so the legal issues presented by the creation of the Conservation Unit remained the same in spite of the change in size.
The central question presented in this suit is: Does an order of the Commissioner of Conservation creating a force pooled unit for one particular sand, which Conservation Unit overlaps a previously Declared Unit formed as to all underlying sands by the lessee under authority of lease contractual agreements, supersede and abrogate this Declared Unit agreement insofar as the calculation of royalties due on production from the Conservation Unit sand is concerned?
This suit was originally instituted with Donald H. Jones as the only defendant. A companion case, entitled "Humble Oil & Refining Company v. Edwin W. Edwards," was also filed against other parties relating to an adjoining tract, also included within the Declared Unit. These two cases were consolidated for trial and on December 16, 1959, judgment was rendered by the trial court in favor of the defendant in each case decreeing, in effect, that the order of the Commissioner of Conservation creating the above-described "Conservation Unit" had the effect of superseding and abrogating the Declared Unit insofar as the calculation of royalties due on production from the Conservation Unit sand is concerned. On appeal, we affirmed the judgment of the trial court in each of those cases. See Humble Oil & Refining Company v. Jones, La.App., 125 So.2d 640, and Humble Oil & Refining Company v. Edwards, La.App., 125 So.2d 654.
The Supreme Court of Louisiana later annulled and set aside the judgments of the district court and of this court in both of those cases, and it remanded the cases to the district court in order that additional "indispensable" parties who owned royalty interests in the Declared Unit area could be impleaded. See Humble Oil & Refining Company v. Jones, 241 La. 661, 130 So.2d 408, and Humble Oil & Refining Company v. Edwards, 241 La. 676, 130 So.2d 413.
By supplemental petition, all parties owning royalty interests in the Declared Unit area since the effective date of the above-mentioned conservation order were impleaded, as ordered by the Supreme Court. Service was made on all resident defendants and the non-resident defendants were cited through curators ad hoc appointed by the court. The companion case of "Humble Oil & Refining Company v. Edwards" was dismissed without prejudice since all parties have been joined in this case.
Answers to the supplemental petition were filed by Donald H. Jones, the original defendant, Pan American Petroleum Corporation, Shell Oil Company, Edwin W. Edwards, L. J. Jones, Eulice Matte, Louis *112 A. Matte, Anton Joseph Ohlenforst, and the parties represented by the curators ad hoc. The remaining defendants did not file an answer.
The defendants represented by one of the curators ad hoc, along with Pan American Petroleum Corporation and Shell Oil Company, filed answers adopting plaintiff's position in this controversy. All of the remaining defendants who filed answers opposed plaintiff's position.
After trial of the case on its merits, the trial court rendered judgment on January 17, 1963, again decreeing that the "Declared Unit" which had been created by plaintiff pursuant to the provisions of the leases had been supplanted and superseded by the subsequently created "Conservation Unit" insofar only as said Declared Unit pertains to the Frio 16 Sand, Reservoir "B". The court further decreed that from and after September 1, 1958, the defendants owning lease or royalty rights in the area covered by the Conservation Unit shall be paid royalty as provided by their respective leases, based on production from the above-mentioned Conservation Unit sand in the proportion that the number of surface acres covered by each respective lease and included within the Conservation Unit bears to the total number of acres included within such Conservation Unit. Also, it was decreed that the defendants owning lease or royalty rights in the "Declared Unit," but outside the production limits of the Conservation Unit, shall not participate in production from said Conservation Unit after September 1, 1958. Plaintiff, Humble Oil & Refining Company, has appealed from that judgment.
On this appeal substantially the same arguments were presented by the parties as were presented when this case was originally before us. No new issues have been raised, and no additional authorities have been cited other than those which we considered when the case was first appealed to this Court. All of the issues presented on this appeal were considered and determined by us when the case was before us originally, and we think all of those issues were properly disposed of at that time.
For the reasons assigned by us in Humble Oil & Refining Company v. Jones, La.App., 125 So.2d 640, therefore, the judgment now being appealed from is hereby affirmed. All costs of this appeal are assessed to plaintiff-appellant, Humble Oil & Refining Company.
Affirmed.
TATE, J., dissents and assigns written reasons.
TATE, Judge (dissenting).
The writer adheres to the views expressed by him in his dissent when the present question was considered by us in the earlier appeal in these same proceedings. Humble Oil & Refining Co. v. Jones, La. App., 125 So.2d 640, 648.
I do not think, however, that either the writer or the majority has sufficiently emphasized the nature of the "contractual unit" formed by the instruments of July 13, 1954, and January 11, 1955.
These instruments, together with counterparts executed by all the other royalty and mineral owners of the affected acreage, specifically amended each lease so as to create this specifically described contractual unit by the express agreement of all the lessors and mineral and royalty owners with the mineral lessee.
The result, therefore, is that we have before us a contractual unit specifically created by joint agreement of the mineral lessee and the owners of all the other mineral or royalty interests affecting the land in question. As noted in my previous dissent, we have here, therefore, the specific written assent of all lessors, royalty and mineral owners with the lessees to form this specific unit "in consideration of the mutual advantages accruing to each."
The present situation is thus to be distinguished from those in which a unit has *113 been declared to be such by the unilateral action of the mineral lessee alone, by virtue of its delegated power to do so granted in the mineral lease.
As to such unilaterally "declared" units, with the greater fiduciary responsibility owed by the mineral lessee to the lessor interests (see McDonald v. Grande Corporation, La.App. 3 Cir., 148 So.2d 441), a different question may well be presented. See Breaux, "Mineral LeaseVoluntary Pooling Clause", 10 Loyola Law Review 224 (1961). (In the first footnote of this interesting article, Mr. Breaux notes the following distinction between a "declared" unit and a "voluntary" or "contractual" unit: "The term `declared unit,' `voluntary unit,' and `contractual unit' are often used interchangeably to signify a unit created by lessor as a result of the delegated authority found in the (voluntary) pooling clause incorporated in an oil and gas lease or a subsequent lease amendment thereto. It is the author's opinion that `declared unit' is clearer and preferred by the oil and gas industry in general. Occasionally the words `voluntary' unit and `contractual' unit are used to indicate units formed under the voluntary pooling clause of the lease, but more often than not these signify a unit created by an express voluntary agreement or compact executed by all interested parties (therefore such an agreement must be signed by all lessors, lessees; owners of royalty, overriding royalty, production obligations, unleased interest, and leasehold or working interest in every tract included in the unit).")
However, we have before us now only a true contractual unit, formed by the express voluntary agreement or compact executed by all interested parties; not a unilaterally declared unit.
My brother Savoy in his concurring opinion in Texaco, Inc. v. Vermilion Parish School Board, La.App. 3 Cir., 145 So.2d 383, 394, summarized the opposing presumptions attaching to the "declared" as contrasted with the "contractual" units as follows:
"(1) Units declared by the lessee alone under the pooling clauses of the different leases. In this type of case, the lessors did not intend to `freeze' their interests, and if the units are thereafter changed by the Conservation Commissioner, the declared units must give way to the Commissioner's units unless the pooling clauses of the lease are specific to the contrary. In other words, there is a presumption here that the change is contemplated. * * *
"(2) Voluntary units, formed through a complete agreement signed by all lessors and lessees, should not be subject to change by the Conservation Commissioner's order unless the parties have expressly stipulated for this change in the agreement. Here it is presumed that the parties intended to freeze their rights because all of the parties participated in the confection of the voluntary unit agreement, and where they agreed on certain fixed interests and did not contract to have them changed, their contract should be the law of the contract * * *." (Italics mine.)
Here, by specific compact voluntarily executed with the lessee by all the mineral lessor and royalty interests, the parties formed a voluntary unit expressly agreeing upon formation of this specific drilling unit and upon sharing any mineral production therefrom in fixed proportions based upon the surface acreage. This is thus the second type of unit described abovethat is, a contractual unit, not a declared unit. It is thus not presumed that the parties intended for their contractual rights fixed by this express agreement to share in the production allocated to any of the acreage within the voluntary unit formed by them, to be divested by orders of the Commissioner issued pursuant to his conservation powers.
As stated in the writer's original dissent, therefore, I "must register a strong dissent from any view that an order of the Commissioner *114 of Conservation may, in the absence of any conservation necessity, alter or destroy the contractual rights of private parties to share in oil production. With the utmost respect for the views of my brethren, I must also point out that no legal authority is cited which holds that a conservation order of the Commissioner destroys private contractual rights not in conflict therewith and that, in fact, the preponderant jurisprudence is contrary to the result here reached." 125 So.2d 648.

On Application for Rehearing
En Banc. Rehearing denied.
CULPEPPER, Judge (concurring).
I concur in denial of a rehearing, but wish to state that I understand the pooled unit formed by Humble was a "declared unit", formed at the option of the lessee, and not a "voluntary" or "contractual unit", formed by the express and common contract of the mineral owners of each tract affected, with each other and with their mineral lessees. If we were dealing with a "voluntary" or "contractual unit" a different result might be required, but that question is not before us, in my opinion.
Able counsel for Humble, in their application for rehearing, have pointed out that the original majority opinion of this court makes no distinction between a "declared unit" and a "voluntary" or "contractual" unit, leaving the impression that in either event the unit is superseded by the subsequent unitization order of the Commissioner of Conservation. The dissenting opinion by Judge TATE interpreted this to be a contractual unit not a declared unit. It is my interpretation of the facts that this is a declared unit, not a contractual unit.
A brief review of the leases in question shows that two of them originally had no pooling provision at all. As to these, amendments were obtained by the lessee from the interested parties giving a detailed course and distance description of the unit which could be declared by the lessee at its option. The Donald Jones lease contained a provision authorizing the lessee to declare pooled units, but with the stipulation that prior approval of the lessor was required as to the exact size and shape of the unit. A lease amendment was obtained from the lessors under this tract authorizing the lessee, at its option, to form such a unit. The remaining five leases contain standard pooling clauses, authorizing the lessee to declare pooled units within a certain size limitation when in the lessee's judgment such action was "* * * necessary or advisable to do so in order properly to develop and operate said leased premises in compliance with the orders, rules and regulations of State and Federal Governmental authority, or when to do so would, in the judgment of lessee, promote the conservation of oil and gas from said premises."
Pursuant to the authorization contained in these leases and amendments, Humble Oil & Refining Company, by an ex parte declaration, created the pooled unit in question here. This unit was not created by a common contract executed by all the mineral owners under each lease and their respective lessees. As was pointed out by Judge SAVOY, in the majority opinion which this court rendered when the case was before us previously (La.App., 125 So.2d 640), it does not appear that the lessors here have expressly agreed with each other to freeze their interests in a certain and specifically described unit, which would remain in effect regardless of subsequent orders of the Commissioner of Conservation. On the contrary, the lessors have authorized the lessee to declare a unit, as necessary or advisable in order to develop and operate the leased premises, in compliance with the orders of the State Authority or to promote the conservation of oil and gas from said premises. It is my opinion that when the lessors signed such a pooling authorization they contemplated that even though a unit might be declared it would be subject to change later by order of the Commissioner of Conservation, for conservation purposes.
*115 Succinctly stated, it is my opinion that since this was a declared unit it is superseded by the subsequent Commissioner's order. If it had been a "voluntary" or "contractual" unit, formed by an express contract between all of the mineral owners and their lessees, a different result might be required.
For the reasons expressed, I concur in the denial of a rehearing.
TATE, Judge (dissenting).
It is obvious that at least a majority of this court, including the writer, are of the opinion that a "voluntary" unit is not destroyed by the creation of a "commissioner's" unit which includes part of the acreage formerly contained in the contractual unit. See Judge CULPEPPER'S concurring opinion above; see Judge SAVOY'S concurring opinion in Texaco Inc. v. Vermilion Parish School Board, La.App. 3 Cir., 145 So.2d 383, 394. In denying a rehearing, therefore, a majority of this court must have concluded that what we have before us is a "declared" unit, as contrasted with a "voluntary" (or "contractual") unit.
Thus, on rehearing, the issue to be determined narrows down to whether the original 160-acre unit created on January 11, 1955[1] was of the nature of a declared unit, as contrasted with a voluntary unit. If it was the former, a majority believed that the commissioner's unit superseded it; if it was the latter, in all probability, a majority of this court would have reached an opposite conclusion.
The writer must frankly admit that, as a result of the court study and discussion centered upon this particular issue, he is considerably shaken in his original opinion that the original 160-acre unit is really a contractual unit rather than a declared unit. But the discussion and study indicate the uncertainty of the jurisprudence as to the determinative criteria distinguishing the two types of units, as well as to the uncertainty as to whether the creation of a commissioner's unit completely supersedes either type.
In my original dissent in this appeal, I was in error in stating that all eight leases contributing to the original unit were amended in order to create the specific contractual unit with which we are concerned. Only three of them (Exhibits: H-1, Jones Lease; H-15, Ohlenforst Lease; and H-16, Reiners Lease) were so amended as to authorize the formation of this contractual unit, specifically described by courses and distancesand this one only.
To reiterate what was stated in the earlier dissent, each lease so amended, was amended with consent of all mineral or royalty owners involved, with the specific agreement that, as to this particular unit only, the mineral production therefrom should be divided proportionately in accordance with the surface acreage represented by the dividing mineral interests.[2] If the specifically described unit had been created directly by such amendment to the lease, I think there is no doubt that it would be a "contractual" as contrasted with a "declared" unit, according to the sources cited in the writer's original dissent.
Here, however, the lease amendments did not directly create the unit; the lease amendments authorized the lessee to do so. Nevertheless, the pooling power of the lessee was limited to the power to create this specifically described unit and this one only.
*116 To my notion, the unit thereafter automatically "declared" by the lessee upon securing the authority of all the lessor interests to form this specific unit by a "special" pooling clause, is something different than one formed through the unilateral power of the lessee to declare any unit it wished (within certain space limitations) under the ordinary "general" pooling clause.
In the present situation, the lessor interests of the three leases expressly consented in late 1954 to the creation of this particular unit and this unit only, in order to share in the production of the particular unit well drilled thereon, which was successfully completed on January 23, 1955. The formation of the unit at the same time as the drilling, required an express agreement by the lessor interests as to the particular acreage to share in the production if the lessor interests did thus consent to the pooling.
This is not a situation, then, where the lessee alone unilaterally determined the location of the unit and whether a well should be drilled upon it. This is more a situation where, in exchange for lessee's drilling a well at that particular time and place, all of the lessor parties participated in the confection of a voluntary unit in which the interest of each to share in the mineral production was fixed in accordance with their surface acreage.
It may be argued that the present unit did not come into existence solely because of the "special" pooling clause in the three leases we have been discussing. Other acreage was included in the unit declaration by virtue of "general" pooling clauses of the other five leases which also contributed acreage to this 160-acre unit. However, if a unit formed by virtue of a special pooling clause creates a contractual instead of a declared unit, then the unit so formed might be considered contractual insofar as the lessor interests included therein by virtue of a special pooling clauseeven though considered to be a declared one, insofar as the acreage of the lessor interests under the other five leases pooled by virtue of general pooling clauses.
As noted by my dissent on the earlier appeal, the lessor-interest acreage included in the first 160-acre unit and left out of the "commissioner's" unit, will be deprived of any right to share in the mineral production of the commissioner's unit, if indeed the first unit is destroyed by the creation of the latter. I note that answers to the appeal have been filed on behalf of sixteen parties who were prejudiced by the trial court decree that no further share in production from the unit well shall be allowed to acreage of the first unit not included in the later commissioner's unit. Some of them are holders under 1933 leases which originally granted the lessee no pooling power whatsoever, but which were amended in 1954 (on the eve of drilling and production) to provide a special pooling clause so as to permit the formation of the particular 160-acre unit, which the majority has now declared was superseded in 1958 by the creation of the commissioner's unit.[3]
Thus these parties, who (either themselves or through their ancestors in title) expressly consented to the formation of this specific 160-acre unit in order to share in production from the well immediately drilled thereupon, are now deprived of any right to share in the production from this same well (insofar as their acreage is now omitted from the commissioner's well).
Under the conservations powers, and to avoid the drilling of another well, it might be necessary, via the commissioner's unit, to allocate some of the production from the unit well to acreage adjacent to the original 160-acre unit, since the unit well may be draining such adjacent acreage, according to the commissioner's findings. The conservation laws may require this for conservation *117 purposes, even though this adjacent acreage contributed nothing to the formation of the 160-acre unit which was necessary for the drilling of the successful unit well.
But because this diversion of production from the original unit interests is necessary because of conservation purposes, does not in my opinion justify the destruction of these interests's previously accrued contractual rights to share in production. It is to be remembered that these original-unit interests contributed to the successful drilling of the unit wells and also that, because of the special pooling agreement, they may have surrendered other contractual rights to enforce further development of their own particular tracts instead of that upon which the unit well was drilled.
Further, once a well has been brought into production even upon a "declared" unit, the lessor mineral and royalty interests in the acreage within the declared unit should acquire some sort of a vested right to share in the production attributable to that declared unit under the pooling agreement in the leases. See McDonald v. Grande Corporation, La.App. 3 Cir., 148 So.2d 441, 446 (footnote 4). As a result of the declaration of the unit, in exchange for the right to share in production from any acreage within the unit, the lessors lost the sometimes valuable right to have their own land either drilled or eventually released from the mineral lease.
Whether their land was included by virtue of a special or of a general pooling clause, the lessor interests cannot be said to have intended, in executing a lease with a pooling clause, that, after production has been achieved upon a unit so formed, they may nevertheless be deprived of their right to share in it upon a belated finding that, after all, their acreage did not really contribute to the production. (In the present case, the commimssioner's "finding" to this effect was made three years later.)
During the interval, the drilling of the unit well and production therefrom have kept their pooled mineral acreage out of commerce insofar as further leasing or development were concerned. The existence of the unit may even have prevented prescription of outstanding royalty interests affecting their land outside the unit (Crown Central Petroleum Corp. v. Barousse, 238 La. 1013, 117 So.2d 575).
How can it be said that a contractual relationship with all these real consequences upon valuable property rights, was intended by the parties to vanish as if never created in the first place, simply upon a later determination by a conservation official that the affected minerals were not (according to then-current geological opinion) really under some of the land included within the pooling relationship? How can it be said that, by the pooling clauses, the lessor interests intended to surrender rights of development of their own land in order to share in production from a unit well, but also intended to contract to permit themselves to be deprived of their share in such production if the unit well was actually successful?
I do not think such an interpretation of the intended effect of pooling clauses is realistic. Nor is it fair to landowner interests, in whose favor, according to the jurisprudence, ambiguities in leases should be construed, since the leases are prepared by the lessee interests, which also have much the greater bargaining power of the two.
The conservation order of the Commissioner should no more be able to destroy the contractual rights of the parties to the leases than such order could, for instance, alter the contractual rights of the lessor and lessee interests to receive their specified proportionsone-eighth, three-sixteenths, etc.of the mineral production which is allocated to any of the land subject to the mineral leases in question.
We must note here that the lessor and royalty interests of acreage within the old 160-acre unit, but not included in the Commissioner's unit, are by the majority ruling deprived of the right to receive any royalties whatsoever of the production which is *118 allocated to the old contractual unit and which they received without question from 1955 (when the first producing well was brought in) until 1958 (when the commissioner's unit was created). It is thus decreed that the interests owned by these royalty owners are now valueless, although from 1955 through 1958 they were retained, bought, or sold based upon their market value as producing royalty ownerships.
Such a judicial holding is bound to create confusion and uncertainty as to the valuable property rights represented by producing royalty interests everywhere in the state, for by the majority opinion these holdings can become worthless at any time that the Commissioner exercises his conservation powers so as to create a unit which includes the producing wells paying the royalties to the contractual-unit interests, but which does not include the acreage affected by the producing royalties.
Private property rights may be subject to regulation under the police and conservation powers of the state. They are not, however, subject to confiscation under such powers. The Commissioner is without interest or power to alter the express contractual rights agreed upon between the private parties.
Taking into consideration all the factors above set forth, it seems to me that a rehearing should have been granted if only to clarify the majority ruling, to specify it as pertaining to a declared unit only.
The previous jurisprudence is uncertain or non-existent concerning some of the questions before us, which are of great concern to the landowners and the oil industry of this state. These questions, directly or by implication, include:
Does the creation of a commissioner's unit have any effect whatsoever insofar as ending the right of lessor interests to share in production allocated to omitted acreage which had formerly been within a private (non-governmental) unit created by the parties themselves, either by special contract or by general lease provision?
Does the creation of the commissioner's unit have effects which are different as to a declared as compared with a voluntary unit?
If so, what are the criteria of a declared as compared with a voluntary unit in this regardfor instance, is a declared unit simply one where it comes into existence because of an instrument by the lessee "declaring" it?; or, despite the mere formality of the "declaration" of it by the lessee, may the unit nevertheless be a "voluntary" one, where its creation involves a specific agreement by the lessor interests as to its specific composition (e. g., as by what we have denoted above as a "special" pooling clause)?
Perhaps the guide-lines and principles to be applied in the resolution of questions arising in this uncharted area of mineral law, can be supplied only by the Louisiana Supreme Court, which has with sparse legislative assistance to date created the great body of now-settled Louisiana mineral law in a process hailed by scholars as a great judicial achievement.
NOTES
[1] See Exhibit H-3. This unit is referred to on the former appeal, La.App., 125 So.2d 640, in the opinion of the majority as the North Crowley Gas Unit Number 3, and in the dissent at La.App., 125 So. 2d 648 as the "contractual unit".
[2] The amendments are contained in more than forty identical instruments, which the writer in his original dissent herein incorrectly described as amending all the leases involved instead of just three of them. See Exhibit H-2, signed by fourteen mineral or royalty owners, as well as the forty-odd other amendment agreements following H-15, each signed by one or more of the mineral or royalty owners.
[3] I refer to defendants 39, 71, and 72 under the Ohlenforst lease, and to defendants 114-116 and 130-135 under the Reiners lease, as so numbered on Exhibit A of trial court judgment, Tr. 136 and following.