## Appeals of Pennzoil Co. & Westrans Petroleum, Inc.

*John Carroll,* for Commonwealth.

*Louis Emanuel* and *Thomas Lamb,* for appellants.

BROUGHTON, *Chairman*, July 26, 1974—This appeal is from spacing order no. 12, dated April 27, 1973, issued by the Oil and Gas Division of the Department of Environmental Resources (department) pursuant to section 7 of the Oil and Gas Conservation Law of July 25, 1961, P.L. 825, 58 PS §407. Natural gas was discovered in the Roaring Run Gas Pool on December 11, 1970, by Pennzoil Company (Pennzoil), at a depth of 7,235 feet in the Onondaga Chert-Oriskany Sandstone formation. Spacing order no. 12 was issued following hearings held on April 16 and 17, 1973. It defines spacing units for the Roaring Run Pool of approximately 320 acres each, as more specifically delineated on a map attached to the order. Appeals were taken by Pennzoil and Westrans Petroleum, Inc. (Westrans).

Pennzoil appealed from two provisions of the order that (1) divided four 640-units that Pennzoil and its lessors had previously established into eight 320-acre units, (and from a portion of the order that rearranged the boundary lines of the previous 640-acre units), and (2) required that the wells previously drilled on those 640-acre voluntary units be shut in until new wells were drilled on the second set of 320-acre units established by the order within the area previously covered by 640-acre voluntary units. Westrans appealed from the order insofar as it added an area of approximately 150 acres to the spacing unit on which Westrans was already operating, a 155-acre tract owned in fee by Canterbury Coal Company, a sister or parent corporation of Westrans.

At a pre-hearing conference, question was raised whether this board was, under law, to serve as the initial decision maker, deciding all questions de novo and ab initio, or to serve as a strictly appellate body.

This board would function as the initial decision maker under the theory that, since section 1921A(b) of The Administrative Code of April 9, 1929, P.L. 177, as amended by the Act of December 3, 1970, P.L. 834 (hereinafter referred to as "Act 275"), 71 PS §510-21(b), gave the Environmental Hearing Board the power to hold hearings that would previously have been held by the Oil and Gas Conservation Commission, then the power to make the substantive decisions previously (prior to the enactment of Act 275) made by the Oil and Gas Commission only after hearing must also be given to the Environmental Hearing Board and not to the department. We rejected this argument in an interlocutory ruling of March 1, 1974, on the theory that,

given the technical nature of the duties of the Oil and Gas Conservation Commission, it was not reasonable to conclude that its duties were intended to be assumed by the Environmental Hearing Board, merely because performance of those duties involved the holding of hearings. It was much more reasonable to conclude that the Oil and Gas Division of the department was intended to perform those duties initially, subject to appeal to this board. We concluded, therefore, that this board was to function in this case in an appellate capacity only.

On further reflection, we would add the following:

Section 31 of the Administrative Agency Law of June 4, 1945, P.L. 1388, as amended, 71 PS §1710.31, requires that an adjudicatory action by any administrative agency be taken only after hearing. Section 1921A(a) of The Administrative Code of 1929, supra, 71 PS §510-21(c), permits the department to take any action without holding a hearing *prior* to taking that action, provided that there is opportunity for a hearing before the action becomes final.[1] Section 7 of the Oil and Gas Conservation Law merely provides with particular reference to the Oil and Gas Conservation Commission what

---

1. Section 1921A(c), 71 PS §510-21(c), provides as follows:

"(c) Anything in any law to the contrary notwithstanding, any action of the Department of Environmental Resources may be taken initially without regard to the Administrative Agency Law, but no such action of the department adversely affecting any person shall be final as to such person until such person has had the opportunity to appeal such action to the Environmental Hearing Board; provided, however, that any such action shall be final as to any person who has not perfected his appeal in the manner hereinafter specified."

The Administrative Agency Law, supra, provides generally. Taking section 1921A of The Administrative Code of 1929, supra, as a whole, we are convinced that section 1921A(b)[2] was not intended necessarily to convey to the board the subject matter jurisdiction to make the initial decision even in cases where a prior agency, such as the Oil and Gas Conservation Commission, was given by a particular statute the power to act only after hearing. Such cases would be treated no differently from cases where the requirement for hearing derives from the general requirements of The Administrative Agency Law, *unless* the subject matter of the decision is so bound into the hearing process itself that even an initial decision made without a hearing might be regarded as legally invalid. The latter is not the case here. It follows that the department, in performing the duties of the former Oil and Gas Conservation Commission, may act with or without a hearing, as it chooses; specifically, it is not required to hold a hearing prior to issuing a spacing order. The hearing on appeal before this board would then be the hearing that would satisfy the hearing requirements of the Oil and Gas Conservation Law, supra.

Question was also raised whether, if we functioned in an appellate capacity, we should receive evidence, relating to the reasonableness of the department's decision, accumulated or acquired since the date of that decision. We held, since the department had the power to modify its spacing

---

2. Section 1921A(b), 71 PS §510-21(b), provides as follows:

"(b) The Environmental Hearing Board shall continue to exercise any power to hold hearings and issue adjudications heretofore vested in the several persons, departments, boards and commissions set forth in section 1901-A of this act."

order, that if any parties believed that subsequently accumulated evidence called for a different spacing order,[3] the proper procedure was to petition the department for a change in spacing order no. 12, based on that evidence. The department's decision would then be subject to review by this board. In this instance, we, therefore, limit ourselves to adjudicating the reasonableness of the department's decision as of the date when it was made.

## FINDINGS OF FACT

I. Findings of fact nos. 1, 2, 3, 5, 8, 9, 10, and 11 of spacing order no. 12 are hereby affirmed, and we make the same findings of fact, to wit:

1. The testimony indicates that Pennzoil Company is the operator of the Canterbury Coal Well (ARM-1272) (hereinafter referred to as "Pennzoil R. R. #1 Well") located on the 50-acre Canterbury Coal Lease situate in Kiskiminetas Township, Armstrong County, Pa. The well was completed on December 11, 1970, to a depth of 7,235 feet, obtaining production in the Onondaga Chert-Oriskany formations wherein the top of the Onondaga Chert is 7,042 feet, and the top of the Oriskany is at 7,194 feet, said well having an open flow of 2.170 MCF after fracture. To date the only production obtained from the Onondaga Chert-Oriskany formation is gas. Rock pressure was 3,915 psig in five days. The discovery of gas in the well has established the existence of an Onondaga Chert-Oriskany gas pool at the location and at the depths described.

---

3. The evidence in question, which both Pennzoil and Westrans sought to introduce, was the production records for their various wells subsequent to April 17, 1973. This would obviously have been entirely unavailable as of that date.

2. There have been four other wells drilled following the completion of the discovery well, these wells are as follows:

Pennzoil Company #1 ASCS Unit, Permit (ARM-1365), total depth 7,492 feet. Kiskiminetas Township, Armstrong County.

J & J Enterprises, Inc. #1 Stringer, Permit (ARM-1482), total depth 7,430 feet. Kiskiminetas Township, Armstrong County.

J & J Enterprises, Inc. #1 Chambers, Permit (ARM-1483), total depth 7,570 feet. Kiskiminetas Township, Armstrong County.

Canterbury Coal Company C. C. #1, Fee, Permit (ARM-1453), total depth 7,210 feet. Kiskiminetas Township, Armstrong County. (Hereinafter referred to as "Canterbury-Westrans Fee Well").

Each of the above wells is completed as a gas well from the Onondaga Chert-Oriskany formation except that the final decision of the J & J Enterprises, Inc. #1 Chambers, has not been made. Of these five wells, Pennzoil's C. C. Well R. R. #1 and the ASCS Unit #1 and the Westrans Petroleum, Inc., C. C. #1, Fee have been produced.

3. In the case of Pennzoil's C. C. #1, (Pennzoil R. R. #1 Well) Pennzoil's ASCS Unit #1, J&J Chambers #1, voluntary 640 ± acre units have been established. In the case of Westrans Petroleum, Inc. C. C. #1, a voluntary unit of 150 ± acres, has been established.

5. Testimony presented indicates a difference of opinion between the operator as to the number of acres to be included within a drilling unit that can be drained efficiently and economically by a single well, ranging from 160 acres to 640 acres.

8. The existing physical facts, the topography, and the testimony indicate that no well should be

drilled for the production of gas from the Onondaga Chert-Oriskany horizons within the area spaced by the order, closer than 2,000 feet from any new well drilled for gas from the said horizons.

9. The existing physical facts, the topography, and the general lease condition indicate that no well should be drilled into the Onondaga Chert-Oriskany horizons in the spaced area closer than 1,000 feet to the nearest boundary line of any of the drilling units approved by the order, excepting those wells now completed or drilling at the date of the order.

10. The royalty interest in the drilling units as established by the order should be integrated in accordance with section (8) of the Oil and Gas Conservation Law.

11. The existing physical facts, the topography, and general conditions in the area indicate that in the event any of the units approved by this order shall not have been drilled before three years from the date of this order, any such unit on which no well shall have been drilled should be released from spacing order control.

II. Finding of fact no. 6 of spacing order no. 12 is affirmed in all respects, and we make said finding of fact, except as it may be modified by our finding of fact no. III, infra:

6. The testimony and the existing physical facts indicate to the department that 20 drilling units, ranging from 261 to 370 acres delineated as on Applicant's Exhibit A as modified, will result in the efficient and economic development as a whole and will protect the correlative rights of the operator and royalty owners involved.

III. Finding of fact no. 4 of spacing order no. 12 is

not affirmed. There was no substantial evidence on the record either before the department or before this board tending to show that the fault zone along the southeastern side of the Roaring Run Pool and included within spacing order no. 12, either contained gas or, if it did, that the gas it contained was continuous with, or part of, the Roaring Run Pool. There is no evidence bearing on whether there is gas within the fault zone and, from what little evidence was submitted, any gas that may be in the fault zone is at least not a part of or in communication with the Roaring Run Pool.

## DISCUSSION

The various issues raised by the parties will be discussed seriatim.

1. *Is there substantial evidence to support the finding that the appropriate size of the spacing units should be approximately 320 acres?*

We find there is. The determination of the size of spacing units in a gas field is governed by the criteria specified in section 7(3) of the Oil and Gas Conservation Law, supra.[4] In particular, section

4. Section 7(3) of the Oil and Gas Conservation Law, supra, 58 PS §407(3), provides as follows:

"On the date specified in the notice, the commission shall hold a public hearing to determine the area to be included in the order and the acreage to be embraced within each unit and the shape thereof and the area within which wells may be drilled on such units. Evidence of the following facts may be considered by the commission in entering its order:

"(i) The surface topography and property lines of the lands underlaid by the pool.

"(ii) The plan of well spacing then being employed or proposed in such pool.

"(iii) The depth at which production from said pool has been found.

7(3)(v) may be analyzed into a combination of economic and physical factors:

(a) Wells should be close enough together to extract substantially all the gas in the field.

(b) Wells should be far enough apart that they will be pumping as little as possible from the same areas.[5]

---

"(iv) The nature and character of the producing formation or formations, and whether the substances produced or sought to be produced are gas or oil.

"(v) The maximum area which may be drained efficiently and economically by one well.

"(vi) Any other available geological or scientific data pertaining to said pool, which may be of probative value to said commission in determining the proper spacing and well drilling unit therefor, with due and relative allowance for the correlative rights and obligations of the producers and royalty owners' interest therein."

5. Since wells are assumed to drain approximately circular areas, it is geometrically impossible to drain all the gas in a field and at the same time to completely avoid having wells drain some of the same areas. The ideal would be hexagonal areas or, failing this, squares. In actual fact (as distinguished from assumption) gas probably drains along and from some indefinite area surrounding fractures—either natural or artificially induced fractures. The Oriskany sandstone in this pool appeared to have little natural fracturing, and artificial "hydrofracing" was necessary for all the wells. It was believed, without real certainty, that these induced fractures would probably run parallel to the fault zone, roughly northeast-southwest. In practice, compromises in shape are made to conform to property boundaries. See section 7(5) of the Oil and Gas Conservation Law, quoted infra, note 7.

When wells "pump against each other" for the same gas, it is known as "interference." As noted, interference may only be minimized, not eliminated. (This is true even in theory, although it is conceivable that some special and probably rare system of fractures combined with exactly the right positioning of wells might just happen to exhaust the field with no interference whatever. That could not be predicted in advance, however.)

(c) Wells should be far enough apart that the total value of the gas extracted will pay off the total amount of drilling, pumping and royalty costs, together with a reasonable return on those investments.

(d) Wells should be spaced in such a way that the total amount of gas that each well can extract can be extracted at a rate that will provide a reasonable rate of return on the investment in drilling, pumping and royalty costs, given current interest rates, gas prices and risks of drilling.

Combining these criteria, the overall decision standard would seem to be to maximize the rate of return to royalty holders and drilling companies, subject to criteria (a), (b), and (c) as constraints, and subject to the other factors enumerated in section 7(3) of the Oil and Gas Conservation Law, quoted in note 4, supra, as additional constraints of considerations bearing on the above criteria of economic efficiency and conservation.

From the record, given the information available, we are satisfied that the department took all of these factors properly into account in deciding that approximately 320-acre spacing units would maximize the economically efficient extraction of gas from the Roaring Run Pool.

We hold that the department's provision for approximately 320-acre spacing units, based on these factors, was reasonable. Pennzoil presented a graph to the department that tended to support its initial judgment in favor of 640-acre units. That graph was constructed from calculations based on economic data and various assumptions about physical data, some of which were more reasonable than others. It was, for example, estimated that porosity of the Oriskany formation was 6 percent to

6.5 percent in line with other Oriskany Sandstone gas fields in Pennsylvania. No information was available on permeability—which appeared, however, to be low, since hydrofracing[6] was required for all five wells drilled in the Roaring Run Pool. Nevertheless, Pennzoil's calculations assumed an open flow (flow without pumping) of two million cubic feet per day—a figure that the department thought was too high, in light of actual records for various wells. A more realistic assumption for open flow led to the conclusion that 320-acre spacing units were appropriate.

Westrans performed alternative calculations based on data from their hydrofracing of the Canterbury-Westrans Fee Well (yielding a detailed analysis of some physical characteristics of the formation), and concluded that 160-acre units would be appropriate. The two sets of calculations represent simply two different methods of arriving at a conclusion relative to the proper sizes of spacing units. On the record, we certainly cannot say that the department was unreasonable in selecting the method of calculation it selected (indeed, it appears that Westran's analysis was considered by the department).

It is especially reasonable in view of the fact that any uncertainty should be resolved in favor of larger, rather than smaller, spacing units. If, in light of actual production experience, it is later shown that 320 acres is too large, additional wells

6. Permeability is dependent in large part on the degree of fracturing of the formation in which the gas is found. If that natural fracturing is too low to provide a good flow at the well, water may be forced into the well under high pressure at a rate that will cause the rock to fracture. This process is called "hydrofracing" (pronounced hydrofracking).

can be drilled without substantial loss of anything except time. If spacing units are designated that are too small, on the other hand, excessive and economically inefficient investments in too many wells may be made before actual production experience is on hand to resolve any initial uncertainties.

Accordingly, we hold the department's selection of approximately 320 acres as the appropriate size for spacing units was reasonable.

2. *Must the department set the spacing units at the same size, or is the variation in the size and shape of the units delineated for the Roaring Run Pool so great as to make the entire spacing order invalid?*

Section 7(5) of the Oil and Gas Conservation Law provides for a variation in size and shape of spacing units in order to account for wells previously drilled, and for irregular property boundaries.[7] The spacing units selected do not appear to us to be so

---

7. Section 7(5) of the Oil and Gas Conservation Law, supra, provides as follows:

"Except where the circumstances reasonably require otherwise, spacing units shall be approximately uniform size and shape for the entire pool: Provided, however, That the commission shall have the power to vary the size and shape of any individual unit in order (i) to take account of wells already completed at the time the application is filed hereunder, or (ii) to make a unit conform to oil and gas property lines: Provided, however, That the units formed by the commission shall conform to the area which will be drained by the well located within the area permitted by the order, and the acreage included in each unit shall be contiguous. In the event that both oil wells and gas wells are found producing from the same pool, the commission shall have the power to create units of one size for oil wells and of a different size for gas wells."

irregular in size as to be invalid, given the provisions in the Oil and Gas Conservation Law, supra, for such variations. The shape of some of the units is extremely irregular,[8] and seems to indicate an assumption that no surface property interest could be divided and assigned to different spacing units. We see nothing in the act that would prevent such a division. Nevertheless, in this case we are convinced that the variations in shape, at least with respect to those spacing units the legal validity of which was questioned in this appeal,[9] are not so great as to make them legally invalid.

It may be that our exclusion of the area underlain by the fault zone, dealt with infra, will make it desirable, and even requisite, to restructure the spacing units in the entire Roaring Run Pool and, indeed, we will make provision for that. But that does not make the units as initially delineated invalid.

3. *Is the division of Pennzoil's four voluntary units legally invalid?*

We have already held that the department was justified, on the facts, in setting approximately 320-acre spacing units for the entire Roaring Run

---

8. See e.g. spacing units N and P, tract no. 62 in unit B, tract no. 17 in unit B, and the exclusion of the tract marked "Lots" at the southern end of unit 4 from the spacing order altogether.

9. We note that the question of variation in size and shape was not raised as a legal issue with respect to many of the units noted in note 8. Westrans raised a question generally, but in argument specified its interest to be primarily in unit E—which could well be made more even, but which is not so misshapen as to be illegal. Pennzoil, which has interests in units A, A', B, B', C, C', D and D', did not complain of their shapes—and indeed has formed voluntary units including these areas.

Pool, including the portion of that pool covered by voluntary units. We also hold that the department is not legally precluded from designating 320-acre units for the portion of that pool covered by the voluntary units, merely because voluntary unitization agreements have been entered into.

The only situation in which the department is precluded, by the Oil and Gas Conservation Law, supra, from varying voluntary agreements is in the issuance of integration orders, under section 8 of the Oil and Gas Conservation Law, supra, 58 PS §408, which provides, in relevant part:

"(a) When two or more separately owned tracts are embraced within a spacing unit, or when there are separately owned interests in all or a part of a spacing unit, the interested persons may integrate their tracts or interests for the development and operation of the spacing unit. *In the absence of voluntary integration,* the commission, upon the application of any operator having an interest in the spacing unit, shall make an order integrating all tracts or interests in the spacing unit for the development and operation thereof and for the sharing of production therefrom. The commission as part of the order establishing a spacing unit or units shall prescribe the terms and conditions upon which the royalty interests in the unit or units shall, *in the absence of voluntary agreement,* be deemed to be integrated without the necessity of a subsequent separate order integrating the royalty interests." (Emphasis supplied.)

This section refers to the integration of royalty interests within a spacing unit. The department's decision relative to the delineation of spacing units is not affected by the provisions of section 8.

We cannot see why the voluntary agreements —contracts—between Pennzoil, J. & J. Enterprises, and the lessor-landowners should preclude the designation of spacing units different from those specified in such agreements. Even if a single landowner had leased to a drilling company prior to the spacing order, there is nothing in the Oil and Gas Conservation Law that would make it illegal for the department to divide that owner's tract between two spacing units, if the application of the various criteria in section 7 of that law led to such a result. Nor is there anything in that law that would make an agreement between several landowners and the same drilling company any more inviolate. If the facts as assessed by the department call for the division of such voluntary "units" into smaller, or different units, and the department's assessment is not arbitrary and capricious, there is nothing in the law that prevents such a division.

It should be noted that this conclusion does not depend on whether Pennzoil's "voluntary units" are considered "Declared Units" or "Voluntary Units" as those terms are defined in Texaco, Inc. v. Vermilion Parish School Board, 145 So. 2d 383 (La. App., 1962) and Humble Oil Refining Co. v. Jones, 157 So. 2d 110 (La. App., 1963), cert. den. 245 La. 568, 159 So. 2d 284 (1964), and discussed in the briefs. Whether or not Pennsylvania would recognize such a distinction for any other purpose, the distinction is not relevant here.

4. *When the department divides one or more units that were operated as voluntary 640-acre units each into two 320-acre units, may it order the shutting in of the wells previously operating on those units until new wells are drilled on the newly created "second half"?*

The department's finding and order relative to the shutting in of wells on "voluntary units" A, B, C, and D are found in findings of fact no. 7 and paragraph nos. 7, 8, 9, and 10 of the order section of spacing order no. 12:

Finding of fact:

7. In order to protect the correlative rights of the royalty owners formerly included in the voluntary designated units, A - B - C - D but now included in the department established units of A' - B' - C' - D' it is established that the wells now completed or producing on units A - B - C - D be shut in until a well is completed on the divided part of the original 640 ± acre voluntary unit.

Order paragraph nos. 7, 8, 9, and 10:

7. Well on unit A as designated on map marked Roaring Run Pool Exhibit A' — Modified be shut in until well is completed on unit A' to and through the Onondaga Chert-Oriskany horizons.

8. Well on unit B as designated on map marked Roaring Run Pool Exhibit A' — Modified be shut in until well is completed on unit B' to and through the Onondaga Chert-Oriskany horizons.

9. Well on unit C as designated on map marked Roaring Run Pool Exhibit A' — Modified be shut in until well is completed on unit C' to and through the Onondaga Chert-Oriskany horizons.

10. Well in unit D as designated on map marked Roaring Run Pool Exhibit A' — Modified be shut in until well is completed on unit D' to and through the Onondaga Chert-Oriskany horizons.

The only specific provision in the Oil and Gas Conservation Law, supra, for the shutting in of wells is contained in section 7(9) of that law, 58 PS §407(9), which provides:

"(9) In the event a permit to drill is refused because of a pending application for a spacing order, as provided in subsection (a) of section 6, and the lease containing the location on which the permit has been refused is being drained of oil or gas by a well or wells on adjoining lands, the commission shall have the power, after notice to the operator of the well or wells affected, and hearing, to shut in such well or wells on adjoining lands if necessary to protect correlative rights, until, and only until, such time as applicant has had the opportunity to obtain a spacing order under section 7": July 25, 1961, P.L. 325, sec. 7.

If the shutting in of wells were necessary in order to prevent waste, as defined in section 2(12) of the Oil and Gas Conservation Law, supra, (58 PS §402(12)),[10] the department could presumably order the shutting in of wells under section 4 of that law: 58 PS §404.

No evidence that would tend to show that waste would occur if these wells are not shut in was pre-

___

10. That section defines "waste" as follows:

"(i) Physical waste, as the term is generally understood in the oil and gas industry, which includes—

"A. Permitting the migration of oil, gas or water from the stratum in which it is found to other strata, if such migration would result in the loss of recoverable oil or gas, or both;

"B. The drowning with water of any stratum or part thereof capable of producing oil or gas in paying quantities, except for secondary recovery purposes, or in hydraulic fracturing or other completion practices;

"C. The unnecessary or excessive surface loss or destruction of oil or gas, and

"D. The inefficient or improper use, or unnecessary dissipation of reservoir energy.

"(ii) The drilling of more wells than are reasonably required to recover, efficiently and economically, the maximum amount of oil and gas from a pool."

sented to the department, or to this board. Indeed, it does not appear that this situation is one that would be covered by the definition of waste.[11] The reason given by the department for ordering the shutting in of the wells was the protection of the correlative rights of the royalty interest holders.

Given the specificity of section 7(9) of the Oil and Gas Conservation Law, we conclude that the department has no legal authority to order the shutting in of wells in other circumstances, unless there is positive evidence that waste will otherwise occur. A fortiori is this so where the only royalty owners whose correlative rights might be adversely affected have already previously agreed to any such possible adverse effect.[12] Accordingly, we hold that paragraph nos. 7, 8, 9, and 10 of spacing order no. 12 were not legally entered, and must be vacated.

5. *Was there interference between the Canterbury-Westrans Fee Well and the Pennzoil R. R. #1 Well that would indicate that spacing order no. 12 should be altered?*

Bruce Zeigler, who made the initial decision relative to spacing order no. 12 for the department, testified that he did not consider the possibility that there was interference between these two wells in deciding on the spacing units chosen, because (a) the testimony that was presented was inconclusive

---

11. The fault, here, if there is one, is not in the drilling of too many wells, but in the drilling of too few.

12. We note that it was agreed that one well would eventually—in about 75 years—drain the entire Roaring Run Pool. Any adverse effect on the affected royalty holders would, therefore, presumably be only that their royalty payments would be received more slowly than they might otherwise hope.

on this question, and (b) one key witness, who could have cleared up at least one element of inconclusiveness, was not produced. This testimony of Mr. Zeigler took the issue out of the case, so far as our review of the department's decision was concerned. We might add that we agree that the testimony that was presented was, indeed, exceedingly inconclusive.

6. *Was it proper to include the area underlain by the fault zone within the spacing order?*

We hold that it was not.

A spacing order is defined by section 7 of the Oil and Gas Conservation Law, supra, to divide a "pool" into spacing units, for the purposes and according to the criteria therein specified. A "pool" is defined in section 2(10) of the Oil and Gas Conservation Law, supra, 58 PS §402(10), as follows:

"(10) 'Pool' means an underground reservoir containing a common accumulation of oil and gas, or both, not in communication laterally or vertically with other accumulation of oil or gas."

The testimony of witnesses for the department was that they did not know whether there was gas in the fault zone or not. Bruce Zeigler, who wrote and signed spacing order no. 12, testified that, while he did not know, he assumed that the persons who petitioned for the spacing order had information on such matters, and that they would not have included the fault zone within the area covered by the petition if that information indicated no gas was there. This seems to be an application of a principle analogous to the presumption of administrative regularity to private corporate decision makers. We do not think such a principle exists; it should not, therefore, be applied here.

Furthermore, what little testimony was presented tended to show that witnesses for Pennzoil did not know either—they testified they thought there was probably gas there (on what basis was unclear), but that the risk of not finding gas would be so great that drilling (at a cost of about $125,000. per well) would be an unwise decision.

The fault zone in question is a strip about 1,300 feet wide, stretching north-northeast south-southwest roughly along the southeastern edge of the Roaring Run Pool, and was included within the area covered by spacing order no. 12. The fault is a downthrust fault, with the Onondaga and Oriskany (and other) formations being about 1,000 feet lower on the southeast side of the fault zone than on the northwest (the Roaring Run Pool is on the northwest side of the fault). Rather than a simple fault, however, along a single plane of slippage, there is a zone, with varying degrees of slippage within the zone (a reasonable interpretation of the seismographic data was presented, as a map, at the hearing before the department, as Pennzoil Exhibit 3).

The testimony indicates that it is unlikely that any gas that is within the fault zone is in communication with the main Roaring Run Pool, so as to be part of the same "underground reservoir containing a common accumulation" of gas. As testified to by the department's witnesses, a fault may act either as a drain for gas, or as a trap. If it is a drain, then the closer a well gets to it, the lower the pressure and the less profitable the well. If it is a trap, then the closer one drills to it, the more profitable will be the well.

It is noteworthy that Charles Updegraff, Petroleum Engineer for the department, who analyzed this spacing order application, testified

that he took into account the relatively large open flow from the Canterbury-Westrans Fee Well, thinking that it indicated that they might be getting close to the fault zone, which acted as a trap. But if it acted as a trap, that would indicate that there was no (or at least very little) gas flow across the near edge of the fault zone, i.e., that any gas that might be in the fault zone was not in communication with, or part of, the Roaring Run Pool.

If it was not, then it does not make sense to apply the criteria of section 7 of the Oil and Gas Conservation Law, supra, to it, as though it were part of the Roaring Run Pool. Those criteria speak to a situation where there is a common pool. If an adjacent area, underlain by gas, is unconnected with the common pool, then it does not make sense to apply economic and physical criteria relative to the efficient extraction of gas from the pool to that adjacent area—if gas is to be withdrawn from the adjacent area it will have to be drilled and pumped separately anyway. Furthermore, just by the language of section 7, spacing orders are to apply to a pool—areas that are not part of a pool may not properly be included within spacing orders under that section. A decision to include an area should be based on more than merely "lack of knowledge to the contrary," and should also be based on more than a legally unsupportable presumption that an applicant for a spacing order has a rational geophysical basis for including the area within the application.

Accordingly, we hold that the area underlain by the fault zone should be deleted from spacing order no. 12, unless and until affirmative evidence is accumulated that the fault zone contains gas that is in communication with and part of the Roaring Run

Pool. Since this may require some reorganization of spacing units, the case will be remanded to the department for this purpose. In view of the strong interest in providing for the further orderly development of the Roaring Run Pool, and in view of the fact that additional information accumulated since April 17, 1973, may require some time—and yet more information—to analyze, we will provide for the designation of temporary spacing units under section 7 of the Oil and Gas Conservation Law, supra, if such rearrangement is to take longer than 30 days.

## CONCLUSIONS OF LAW

1. This board has jurisdiction over this case and over the parties before it.

2. This board's jurisdiction over this case is a quasi-judicial appellate jurisdiction under section 1921A(a) of The Administrative Code of 1929, P.L. 177, as amended, 71 PS §510-21(a). We do not have *initial decision making jurisdiction* as the inheritor of the powers of the Oil and Gas Conservation Commission under the Oil and Gas Conservation Law of July 25, 1961, P.L. 825, 58 PS §§401, et seq., and section 1921A(b) of The Administrative Code of 1929, supra, 71 PS §510-21(b).

3. The department's selection of approximately 320-acre spacing units for the Roaring Run Pool was reasonable in light of the criteria specified in the Oil and Gas Conservation Law, supra, and was based on substantial evidence.

4. The spacing units as designated in spacing order no. 12 are not so irregular in size and shape as to be legally invalid under the provisions of section 7 of the Oil and Gas Conservation Law, supra.

5. Having selected 320 acres as the appropriate size for spacing units in the Roaring Run Pool, it was both reasonable and legal for the department to divide the entire pool, including those portions previously divided into 640-acre "voluntary units" by Pennzoil, into spacing units of approximately 320 acres each.

6. The Oil and Gas Conservation Law, supra, permits the department to order the shutting in of wells only for the purposes specified in section 7(9) thereof, 58 PS §407(9), and to prevent waste. The provisions of spacing order no. 12 ordering the shutting in of the wells on spacing units A, B, C, and D are not for these pusposes, and are, therefore, legally invalid.

7. The conclusion that the fault zone along the southeastern edge of the Roaring Run Pool contained gas which was integrally a part of the Roaring Run Pool was not supported by substantial evidence. Spacing order no. 12 may not, therefore, legally be made to cover the area underlain by that fault zone.

## ORDER

And now, July 26, 1974, it is ordered that:

1. The decision of the department, in spacing order no. 12, to divide the Roaring Run Pool into approximately 320-acre spacing units is affirmed.

2. Paragraphs 7, 8, 9, and 10 of spacing order no. 12 are vacated.

3. The area underlain by the fault zone, as designated on Pennzoil Exhibit 3, is hereby deleted from the area governed by spacing order no. 12, unless and until affirmative evidence is accumu-

lated that there is gas in the fault zone that is part of the Roaring Run Pool.

4. Spacing order no. 12 is hereby remanded to the department for possible revision in light of the deletion of the area underlain by the said fault zone.

5. If such revision of spacing order no. 12 is to take longer than 30 days from the date hereof, the department should promptly designate temporary spacing units under section 7 of the Oil and Gas Conservation Law, supra, in order to provide for the orderly development of the Roaring Run Pool pending the designation of more permanent spacing units.